C-E-I-R, INC. *v.* COMPUTER DYNAMICS CORPORATION ET AL.

[No. 351, September Term, 1961.]

*Decided July 11, 1962.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Paul R. Connolly,* with whom were *John J. Ross, James J. Cromwell, James R. Sharp* and *Hogan & Hartson* on the brief, for the appellant.

*Seymour Friedman,* with whom were *Vivian V. Simpson, Joseph B. Simpson, Jr., H. Algire McFaul, H. Max Ammerman* and *Simpson & Simpson* on the brief, for the appellees.

SYBERT, J., delivered the opinion of the Court.

This appeal requires us to determine whether the Chancellor erred in denying a corporate employer injunctive relief and consequential damages sought against certain of its former employees and a competing corporation formed by them, the employer contending that the employees, while still in its employ, had solicited business from a customer of the employer, and had committed other acts in derogation of the duty of fidelity owed to their employer.

The appellant, C-E-I-R, Inc. (plaintiff below), is a service corporation, with its principal office at Arlington, Virginia, providing, among other things, expert consultants to business, industry and government to assist in the analysis, design, coding and programming of data processing systems employing modern high speed electronic computers. In an effort to expand its business with the federal government, appellant in early 1961 hired Vincent R. Grillo (one of the appellees, defendants below), as director of government liaison at its Arlington center, at an annual salary of $18,000. He was employed under an agreement terminable at the will of either party. In addition, he executed an agreement acknowledging the corporation's right of ownership of any inventions made or conceived by him resulting from his employment, as well as of any of his writings done in the performance of his work, and providing that he would not during or after his employment "* * * publish, disclose or authorize anyone else to publish or disclose any data or information relating to my work for C-E-I-R or any other work of C-E-I-R of which I have knowledge." The agreement stated that the term "inventions" should include "methods or any discoveries of any methods, whether patentable or not".

Soon after Grillo's employment, the need was recognized by the corporate management to develop a capability for business data processing work at the Arlington center, and in

May, 1961, the appellee, Joseph E. Sberro, a systems analyst experienced in such work, was hired to organize and become manager of the new commercial systems department at an annual salary of $15,100. His employment was terminable at will and he also executed an agreement identical to that signed by Grillo, set out above.

The division of claims control of the Bureau of Old Age and Survivors Insurance issues some thirteen million payment checks each month to beneficiaries of Social Security. In the summer of 1961 it was engaged in replacing the punch card processing methods then in use with electronic computers already acquired and installed. However, a division of opinion arose among the Bureau's planners as to whether the electronic data processing system they had begun to use was producing the desired results, and it was decided to employ a firm of expert consultants in the field of computer services to analyze the new procedure as well as an alternative approach being urged within the Bureau, and to make a recommendation as to which system was deemed preferable. C-E-I-R learned through one of its salesmen of the need of the Bureau for consulting service and assigned Grillo, as its director of government liaison, to negotiate with the Bureau for a contract. Largely through Grillo's efforts a contract was executed on August 30, 1961, whereby the corporation would provide the services of four or five computer systems analysts to the Bureau for a period of 90 days, at a cost not to exceed $30,000, with the purpose of developing the approach and methods best suited for attaining the most efficient application of electronic data processing in the Bureau's division of claims control. Though this contract was one of short duration, it was recognized at the time by the officers of C-E-I-R and Grillo that the contract might prove to be an important step in obtaining continuing work at the Bureau for several years.

Work under the contract commenced in early September, 1961, when a project team, with Sberro as its leader, was sent to Bureau headquarters in Baltimore. Included among the four other members of the team were Michael W. Pulscak (a defendant below and an appellee here) and Sidney I. Riskin,

both of whom had been hired for work on the Bureau contract and had signed employment agreements and agreements concerning inventions, etc., identical with those of Grillo and Sberro.

As a result of the intensive study made by the project team, C-E-I-R submitted a recommendation to the Bureau on October 18, 1961, which proposed that the Bureau abandon the changeover plan it was then using and in its place develop details of an alternative electronic data processing system, the rough outline of which had earlier been formulated by the Bureau. The recommendation was accepted by the Bureau.

Since C-E-I-R had consumed only half of the time anticipated under its contract with the Bureau to complete its study and formulate a recommendation, the Bureau decided to use the remainder of the funds available under this contract to begin the task of designing an overall data processing system in accordance with the C-E-I-R recommendation. It was recognized, however, by Grillo, Sberro and the government officials concerned that additional consulting service far beyond the termination of C-E-I-R's existing contract with the Bureau would be necessary, and that any future contracts for such service would be let out on bids.

The direction of the work being performed by the C-E-I-R team therefore changed after October 18, 1961, and, in conjunction with Bureau personnel, an intensive study of the Bureau's operation and requirements in regard to the claims division commenced. Such knowledge was recognized as a basic foundation for beginning any design of a new data processing system for the Bureau. An *"ad hoc* systems committee", recommended by C-E-I-R, was set up to assimilate this vital information, with Sberro as its acting chairman. The appellee Pulscak, as well as certain Bureau employees, were members. Riskin continued to work with the Bureau's computer technicians. All the C-E-I-R employees involved, including those named above, thus became thoroughly familiar with basic operations and requirements of the Bureau's claims division and although future contracts would be let out by competitive bids, C-E-I-R had a reasonable basis for expecting to be in a fa-

vored position in light of the experience it had already gained with the Bureau.

However, in early November, C-E-I-R learned of Grillo's plans to resign in order to become president of Computer Dynamics Corporation (one of the appellees here), incorporated on November 7, 1961, through the efforts of Grillo. Its purpose was to provide services in the field of business data processing similar to those afforded by the new commercial systems department set up by C-E-I-R, and thus in this area it would be a direct competitor of C-E-I-R.

The date when Grillo made known his intention to resign was in dispute. Grillo believed that it was November 7. There was strong evidence introduced, however, indicating that he informed his superior, Dr. James P. Walsh, a vice-president of C-E-I-R, of his plans to leave on November 9, 1961. At the trial certain acts of Grillo were established as taking place before that time. Soon after the Bureau had accepted C-E-I-R's recommendation on October 18, 1961, to design a new data processing system, which would require consulting service far into the future, Grillo approached Sberro with his plans to form a new company, obviously with designs on the future contracts which he knew would emanate from the Bureau. Sberro accepted the offer to join with him in this effort. With a flurry of activity, they performed all the prerequisites necessary to bring the corporation into existence by November 7, 1961, with no knowledge on the part of their employer. Around November 1, 1961, according to the testimony of George E. Rawson, director of the Central Planning Staff of the Bureau, who was concerned with the C-E-I-R project, he was approached by Grillo who informed him of his plans to form Computer Dynamics. The official stated that Grillo "said he hoped when they got organized and got in business they'd have an opportunity to compete for the Bureau's business," and that "Computer Dynamics would be interested in any subsequent technical support requirements that might be generated by the Bureau." In answer to a query by Rawson, Grillo admitted that C-E-I-R did not know of his plans as yet. Rawson called the matter to the attention of his superior, Roy E.

Touchet, who also talked with Grillo a day or two later in Rawson's presence. Grillo admitted at the trial that he again expressed his hope for consideration of Computer Dynamics for future Bureau business. Both Touchet and Rawson then told Grillo they didn't feel they should become involved in something that was being kept secret and they urged him to clear up his relationship with C-E-I-R.

As a result of this conversation, several days later Grillo hand-delivered a letter to Touchet, dated November 7, 1961, announcing his resignation from C-E-I-R and acceptance of the presidency of Computer Dynamics. In the letter he again expressed his interest in servicing the needs of the Bureau with a staff which would be "composed of thoroughly competent computer systems analysts and programmers * * *." Grillo stated that he delivered the letter on the 7th or 8th of November, which was prior to the date upon which his superior testified he actually resigned—November 9th. Sberro admitted that he, too, spoke to Rawson and Touchet about obtaining Bureau business, before he resigned from C-E-I-R.

In addition to his activities at the Bureau in behalf of Computer Dynamics, Grillo also successfully (and secretly) recruited two other employees of C-E-I-R in early November, Pulscak and Riskin, both of whom had been directly involved in the project at the Bureau, and who continued to take part in C-E-I-R's work there up to the time they actually left their positions. At least two other employees and a prospective employee of C-E-I-R were also approached unsuccessfully by Sberro and Grillo, who spoke of the contract with the Bureau that Computer Dynamics expected to obtain. All of this activity took place secretly while Grillo and Sberro were still in the employ of C-E-I-R.

When Grillo finally did make known his plans to resign he admittedly told his superior, Dr. Walsh, that no one other than himself was involved, although he had already spoken to Sberro, Pulscak and Riskin, and had told Rawson that Sberro was joining Computer Dynamics. There was testimony which indicated that Sberro had also misinformed his superior about his plans to leave when questioned concerning rumors about

the matter. Grillo remained with C-E-I-R until November 15, and Sberro, Pulscak and Riskin submitted resignations on November 20.

On December 4, 1961, Computer Dynamics formally began operations. Anticipating an invitation to bid for the projected Bureau business, Sberro ordered Pulscak, upon his reporting to work for Computer Dynamics, to draft a proposal for the Bureau, which was introduced into evidence. Pulscak conceded, in his testimony, that he could not have composed the proposal in the style and detail shown therein without having had the knowledge which he acquired at the Bureau while employed by C-E-I-R.

On December 12, 1961, Computer Dynamics received a letter from the Bureau as one of six companies (including C-E-I-R) invited to submit bids for further consulting services "to supplement existing Bureau capabilities for planning and implementing a long-range integrated data processing system * * * to be placed into Bureau operations over the next four or five years." C-E-I-R filed suit on December 14, 1961 to enjoin appellees from bidding in response to this invitation and also to recover consequential damages arising out of the conduct of its former employees. On December 15, 1961, the request for bids was indefinitely postponed by the Bureau and has not been renewed, although the testimony indicated that the Bureau still has need for consulting service.

Appellant contended below, as it does here, that it was entitled to the equitable relief prayed for on the ground that the appellees, as employees, had breached their trust and the duty of fidelity they owed appellant by: (1) soliciting their employer's customer; (2) seeking to divert a business opportunity from their employer to themselves; (3) enticing key employees of their employer to join their venture; and (4) acquiring information of a unique and special character which they intend to use to the disadvantage of their employer. At the conclusion of the appellant's case, the Chancellor granted the appellees' motion to dismiss the action, under Maryland Rule 535, holding that appellant had presented no evidence to warrant the relief requested.

It is well settled that the employment relationship is one of confidence and trust and places upon the employee a duty to use his best efforts on behalf of his employer. *Ritterpusch v. Lithographic Plate,* 208 Md. 592, 119 A. 2d 392 (1956). "It is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest." *Maryland Credit v. Hagerty,* 216 Md. 83, 90, 139 A. 2d 230 (1958). Any breach of this fiduciary duty by the employee will entitle an employer to an accounting by the employee in an equity court of the fruits of his wrongful actions. *Nagel v. Todd,* 185 Md. 512, 45 A. 2d 326 (1946).

Courts, however, have not been unmindful that our society has adhered to a strong policy favoring free competition in the economic sphere; hence the right of the individual employee, while still employed, to make arrangements to compete with his employer and become an entrepreneur in his own right was recognized by this Court in the *Ritterpusch* case. Such preparations may take the form, for example, of the purchase of a rival business. However, that case established with equal force the proposition that the employee may not, before the termination of his employment, solicit his employer's customers for such rival business. See also *Meeker v. Stuart,* 188 F. Supp. 272, 275 (D.D.C. 1960), aff'd 289 F. 2d 902; *Sanitary Farm Dairies, Inc. v. Wolf,* 112 N. W. 2d 42, 48 (Minn. 1961); *United Board & Carton Corporation v. Britting,* 164 A. 2d 824 (N. J. 1959), aff'd 160 A. 2d 660; 2 *Rest.* (2nd), *Agency,* § 393, com. (e).

The learned Chancellor rejected appellant's contention of improper solicitation in this case on the ground that C-E-I-R's employment with the Bureau was not permanent or continuous and future business which appellees allegedly solicited was subject to competitive bidding. We think the Chancellor erred in her theory of the law. No such requirement was expressed or implied in the *Ritterpusch* case, and other cases have specifically condemned solicitation by an employee where no contractual relationship existed between the customer and an employer. See, for example, *American Window Cleaning*

*Co. of Springfield v. Cohen,* 178 N. E. 2d 5 (Mass. 1961); *Duane Jones Co. v. Burke,* 117 N. E. 2d 237 (N. Y. 1954).

There would appear to be no precise line between acts by an employee which constitute mere preparation and those which amount to solicitation. However indefinite that line may be, we feel that the appellees crossed over the line into the area of solicitation forbidden to the loyal employee.

The verbal and written "invitations" from Grillo and Sberro to the officials of the Bureau, that they would appreciate consideration of their new competing corporation for future services, taken in isolation, might not of themselves necessarily constitute solicitation. But when all the circumstances surrounding these communications are considered, their nature as solicitations becomes apparent.

A significant and compelling factor is the veil of secrecy in which the appellees enshrouded their activities. We, do not intimate that in all cases an employee must tell his employer of his future plans to become a competitor. However, the rule is well established that an agent is under a duty to disclose to his employer any information concerning the agency which the employer would be likely to want to know. See 2 *Rest.* (2nd), *Agency* §§ 381, 390; 1 *Mechem, Agency* (2nd ed.), §§ 1207, 1353; *Standard Brands, Inc. v. U. S. Partition & Packaging Corp.,* 199 F. Supp. 161 (E. D. Wis. 1961); *Central Ry. Signal Co. v. Longden,* 194 F. 2d 310 (C. A. 7, 1952). In this case, Grillo, Sberro and Pulscak knew of the additional and extensive consulting services which would be needed by the Bureau as a result of its acceptance of C-E-I-R's recommendation after its study under the ninety-day contract. Computer Dynamics then utilized the appellees in key positions for most of the remainder of the term of that contract to gain highly valuable information about the operations of the Bureau which would have put the corporation in a favorable bargaining or bidding position for future business with the Bureau, as was indicated in the testimony of Bureau officials and others. Because of the secret plans of the appellees to become competitors for this same business, an unfair situation was created whereby they were able to absorb this unique experience

and solidify their contacts with Bureau officials on C-E-I-R's time and at that company's expense, and to use these advantages later as planned for the benefit of a competing corporation. The training that the appellees received enabled the Computer Dynamics Corporation to begin immediate operations and the detailed draft proposal drawn up by Pulscak for submission to the Bureau is evidence of the extent of knowledge which the appellees had gained at the expense of C-E-I-R. Under these circumstances, the appellees owed a duty of disclosure of their plans for engaging in competition with C-E-I-R. Had appellant known of these plans it could have taken steps to preserve its own favorable bargaining or bidding position by utilizing employees remaining with the corporation, and it also could have avoided expending considerable sums of money to prepare its own competitors to launch into business. The appellees "chose secrecy and deception under circumstances which demanded * * * candor and full disclosure." *Shell Petroleum Corporation v. Pratt,* 22 F. Supp. 304 (D. Kan. 1938), aff'd 100 F. 2d 833.

The secretive plans of the appellees, considered in conjunction with the recruiting by Grillo and Sberro of other key employees in the project without their employer's knowledge, thus reducing C-E-I-R's ability to compete and enhancing that of Computer Dynamics, and the use by Computer Dynamics of the information which appellees had compiled at their employer's expense (despite the agreement signed by them not to disclose information of this nature), are sufficient to lead us to conclude that the overtures made by Grillo and Sberro to the Bureau while still employed by C-E-I-R constituted wrongful solicitation entitling the appellant to equitable relief. Our view is fortified by the fact that the Bureau officials obviously considered the overtures as solicitation, since they placed Computer Dynamics on the list of those requested to submit bids on December 12, 1961.

Other courts have not hesitated to condemn as a breach of fidelity the act of an employee who seeks to take advantage of his knowledge of future business opportunities of his employer under similar circumstances. In *American Window*

*Cleaning Co. of Springfield v. Cohen, supra,* an employee, Cohen, had prepared a bid to an irregular customer for whom the employer had done work two or three times in the preceding five years. After his discharge by the employer, he solicited business for a rival corporation from the same customer using the figures he had prepared for his former employer to establish his bid. The court in condemning this action stated (at 9 of 178 N. E. 2d) :

> "* * * Cohen appropriated to his own purposes his work done for the plaintiff [employer]. While employed, he had established a pre-contract relationship between the plaintiff and an irregular customer which in due course was likely to ripen into a contract. Knowledge of this was special corporate information. Interference with that relationship, immediately upon discharge * * * and with the use of the plaintiff's bid, we hold was unfair. * * * '[C]onsidering all the circumstances, * * * [this conduct was] unfair.' Restatement 2d: Agency, § 396, comment on cl. b."

Compare *Duane Jones Co. v. Burke, supra; Central Ry. Signal Co. v. Longden, supra; Albert A. Volk Co. v. Fleschner Bros.,* 60 N. Y. S. 2d 244 (1945), aff'd 298 N. Y. 717, 83 N. E. 2d 15; *Frank Sheridan Jonas, Inc. v. Romanat,* 94 N. Y. S. 2d 727 (1950), aff'd 104 N. Y. S. 2d 457, app. dism. 303 N. Y. 616 101 N. E. 2d 487. See also 29 Chi. L. Rev. 339, 354.

As we have indicated, the result of appellees' breach of their fiduciary duty was to give Computer Dynamics an advantageous position in regard to bidding for consulting services with the Bureau, at the expense of C-E-I-R. Although the appellees' motion to dismiss the suit was granted at the close of the appellant's case, the appellees Grillo, Sberro and Pulscak, as well as Riskin and the government officials concerned in this matter, all were called by the appellant and testified fully in direct and cross examination as to all phases of the case (except the matter of damages). Under these circumstances the appellees should be enjoined immediately from bidding for, or otherwise attempting to obtain, or entering, a contract for consult-

ing services in the Bureau of Old Age and Survivors Insurance during the time its claims processing is being automated. As to appellant's prayer for consequential damages, detailed testimony was given by two officials of C-E-I-R as to monetary damages their company had suffered as a result of the damaging exodus of key employees to the competing corporation. The cost to C-E-I-R in the way of increased expenses was placed in four categories by Dr. Walsh, namely, general planning, technical work at the Bureau, additional administration, and recruiting expense. The testimony in regard to several of these areas was specific enough to enable the court to find that C-E-I-R's losses were a proximate result of the wrongful conduct of the appellees. Upon remand of this case, further testimony as to damages should be taken from both sides, in view of the fact that appellees did not have the opportunity to present their evidence in this regard. The court should then assess damages in the proper amount in accordance with all the evidence.

> *Order reversed; case remanded for the immediate passage of a decree for an injunction and for the taking of additional testimony in regard to damages, and for the passage of such further decree as may be appropriate, all in conformity with this opinion; costs to be paid by appellees.*