CHAPMAN, et ux. *v.* FORD, et ux.

[No. 139, September Term, 1966.]

44

*Decided March 13, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*Robert E. Wigginton* for appellants.

*William O. E. Sterling* for appellees.

OPPENHEIMER, J., delivered the opinion of the Court. Mc-WILLIAMS, J. dissents.

The appellees sued the appellants in assumpsit in the Circuit Court for St. Mary's County to recover a sum of money alleged to be due under a mortgage by way of an additional sum, or penalty, because of the sale of the mortgaged property. Judge Dorsey, sitting without a jury, found that the property had in fact been sold by the appellants when they made a prepayment on the mortgage, although the written contract was not signed until a few weeks later, and awarded judgment to the appellees in the amount of $5500, which is ten percent of the amount of the prepayment, with interest and costs. The appellants' motion for a directed verdict at the close of the appellees' testimony was denied.[1] In their appeal, they contend that the motion should have been granted, and that the Judge, in his opinions on the appellants' motion and at the conclusion of all the testimony, was clearly erroneous in his findings of fact and incorrect in his conclusions of law.

A large portion of the evidence is undisputed. On October 24, 1956, Mr. and Mrs. O. Lee Ford, the appellees, lent Mr. and Mrs. William Chapman, the appellants, $92,213.38, secured by a purchase money mortgage. The mortgage covered three pieces of property referred to as the Western Auto property, the St. Mary's City property, and the Physic Hill property. The mortgage indebtedness, with interest at the rate of six percent, was to be repaid in monthly installments of $778.19, beginning December 1, 1956 and continuing for the period of fifteen years, at which time any remaining balance of principal was to become due. The mortgage contained the following provisions:

---

1. The motion should have been to dismiss. Maryland Rule 535, Smith v. State Roads Comm'n, 240 Md. 525, 539-40, 214 A. 2d 792 (1965).

"Provided, however, that the Mortgagors shall have the privilege of paying in larger amounts at any time and provided further, that in the event this mortgage indebtedness is paid off prior to the fifteen (15) year period, or in the event the Mortgagors sell the property hereby mortgaged, then the Mortgagors agree to pay unto the Mortgagees in addition to the principal due with interest, a sum equal to ten (10%) per cent of the principal balance then due. And provided further, that this Mortgage indebtedness shall become due and payable in the event the mortgagors sell or convey the herein mortgaged property, together with the ten (10%) per cent additional sum as above provided."

Some years before 1962, Ford permitted Chapman to sell the latter's Physic Hill property and apply the proceeds to the principal of the mortgage indebtedness, without the ten percent penalty. Ford testified he did this because "I didn't want to make it hard on him, I tried to make it as easy as I could to get him started."

During the summer of 1962, Chapman began negotiations with William E. Virnstein to sell him the Western Auto property. In August of that year, Virnstein called on Ford several times, at the latter's home, told Ford he wanted to buy the Western Auto property, and asked Ford to release it from the Chapman mortgage. Ford replied he would only release the property if he were paid the ten percent. Chapman made a similar request to Ford and received a similar reply.

On August 17, 1962, Virnstein made an application for his wife and himself to the Maryland National Bank, at Leonardtown (the bank), for a mortgage loan of $25,000. The application stated that the purpose of the loan was to pay Virnstein's present mortgage to the bank of $2268.72, the balance "to purchase Bill Chapman's store" (the Western Auto property). On September 7, Chapman made an application for his wife and himself to the bank for a mortgage loan of $55,000. The purpose of the loan was stated to be to pay Chapman's existing mortgage to the bank "and mortgage to O. Lee Ford."

The following events all took place on October 18, 1962: Virnstein and his wife executed a mortgage to the bank, recorded that day, on their bakery property in Leonardtown, in the principal sum of $25,000.00, securing a loan in that amount. The proceeds of this loan, after deducting therefrom the amount necessary to pay off Virnstein's existing mortgage to the bank and costs, were deposited in the account of "W. E. Virnstein". The Chapmans executed a mortgage to the bank, recorded the same day, on their Western Auto property, in the principal sum of $55,000.00, securing a loan in that amount. The proceeds of the loan were deposited in the bank in a new account titled "William A. Chapman—Escrow a/c Atty. Robert E. Wigginton" (the escrow account).

Virnstein drew a check on his account at the bank, payable to the order of the Chapmans, in the amount of $20,000.00. This check represented part of the loan made by the bank to the Virnsteins the same day. There was written on the face of this check: "Dep. on Store in Lex Park" (the Western Auto property). This check was delivered to Robert E. Wigginton, the attorney and agent for the Chapmans, and Mr. Wigginton deposited this check in the escrow account. This check was paid by the bank on the same day, October 18.

Mr. Wigginton mailed to the Fords, in St. Mary's City, Maryland, a check dated October 18, drawn on the bank, payable to the Fords, in the amount of $55,000.00 and signed "Robert E. Wigginton, Atty.—William A. Chapman Escrow Account". This check had written on its face "Part payment on W. A. Chapman Mortgage". Accompanying this check was a letter from Mr. Wigginton to the Fords reading as follows:

"I enclose herewith check to your order in the amount of $55,000.00, which represents a partial payment on the mortgage held by you against Bill Chapman. As of October 1st, the principal balance on your mortgage amounted to $57,637.51. According to my records, this would leave a balance due as of October 1st of $2,637.51. At the present time we did not have sufficient funds to pay you in full; however, we expect more funds in the near future, at which time we may

be in a position to pay the balance due, plus interest to date."

The Fords did not deposit the check until November 23, 1962; when they deposited it, they noted thereon that it was accepted under protest and reserved any rights accruing to them under the terms of the Chapman mortgage.

On October 29, 1962, Mr. Wigginton mailed to the Fords a check dated that day, drawn on the bank and payable to the Fords, in the amount of $2,914.01 and signed "Robert E. Wigginton Atty. William A. Chapman Escrow Account". This check had written on its face "Bal. Mtg in full plus Interest and 10% on Principal balance due." An accompanying letter from Mr. Wigginton advised the Fords that the check covered the principal due of $2,637.51, interest of $12.75 and 10% penalty of $263.75. This check was deposited also by the Fords on November 23, 1962, after they had noted thereon that it was accepted under protest and that they reserved any rights accruing to them under the terms of mortgage.

It is undisputed that, as of October 18, the principal balance of the Chapman mortgage, as stated in Mr. Wigginton's letter, was $57,637.51. The two checks sent by Mr. Wigginton to the Fords, on behalf of the Chapmans, of $55,000 and $2,914.01 paid the remaining principal, with interest. The ten percent penalty was added to the amount of the latter check; it is the failure to pay that additional sum on the $55,000 payment which is the subject of this litigation.

The bank statement of the escrow account shows that the only deposits in that account were the $55,000 received by the Chapmans from the bank and the $20,000 paid to the Chapmans by the Virnsteins as part of the proceeds of their loan by the bank. The Chapmans drew a check on this account in the amount of $2,609.36 to the bank, in accordance with their loan application of September 7, to pay off their indebtedness to the bank. Therefore, the October 18 check to the Fords, from this account, in the amount of $55,000, necessarily included a part of the $20,000 which had gone into the account from the Virnsteins' payment to the Chapmans.

A written contract of sale was entered into between the Chapmans and the Virnsteins for the Western Auto property, dated

November 1, 1962. The purchase price was $125,000, of which, the contract stated, $20,000 "has been paid at the signing hereof." The contract provided that the balance of $105,000 was to be paid, with interest at the rate of six percent, over a period of 115 months, in monthly installments of $1202.88. Possession of the property was not delivered until November 1, at which time the Virnsteins began to receive the rentals from the property. Taxes and insurance were adjusted as of that date, and interest was allowed on the $20,000 deposit from October 18. No settlement sheets were produced.

At the trial below, Chapman was called by the Fords, presumably as an adverse witness. The Fords also put Virnstein on the stand and his pre-trial deposition was put in evidence by them. The Fords' brief alleges that a reading of the testimony of Chapman and Virnstein "shows that they were both evasive and reluctant to give direct answers" and our own reading of the record supports that statement. Chapman first admitted that he arrived at the terms of the sale with Virnstein sometime in October, although he later attempted to change his testimony as to the time of the agreement. Virnstein testified that, on October 18, he and Chapman had agreed on the price and the down payment, as well as on the major details. Virnstein stated that he never knew what the monthly payments would be until just before the November 1 contract was signed, but Ford testified that Virnstein, on one of his visits to the Ford home in connection with the purchase of the property "around August" had stated that he had made an agreement to pay over $1200 a month. As the written contract shows, the monthly payments were to be $1202.88.

All of the documents and financial transactions which have been set forth were offered as part of the appellees' case. In his first opinion denying the appellants' motion, Judge Dorsey said: "It appears to the Court from all the circumstances surrounding this transaction that it is an attempt designed to evade the penalty clause in the mortgage." In his second opinion after the conclusion of all the testimony Judge Dorsey stated:

> "It is inconceivable that the escrow agent, an attorney, would have drawn on the deposit placed in the escrow account by Virnstein unless the transaction

had been fully consummated by the Defendants and Virnstein, the purchaser.

"All of the documentary evidence leads the Court to the conclusion that a legal and binding sale took place on October 18, 1962 between the Defendants and Virnstein, and that in an attempt to evade the penalty clause, it was not formalized by a Written Contract until November 1, 1962."

The appellants contend that, even if an oral agreement of sale and purchase had been made by October 18, 1962, which they deny, that agreement was not enforceable because it had not been in writing and was therefore unenforceable under the Statute of Frauds. Even in equity, they argue, the agreement would not have come under the partial performance exception, because even if part payment had been made, possession had not been given to the purchaser. We shall consider later the question of the applicability of the Statute of Frauds to the situation presented in this case. At this stage of our discussion, it is sufficient to point out that the finding of the court below that "a legal and binding sale" took place on October 18 necessarily includes the finding that an oral agreement of sale was effected at that time. We hold that this finding is amply supported by the record.

The appellants contend here, as they did below, that there was not sufficient evidence, in any case, to show that Mrs. Chapman was a party to the agreement. They point to the undisputed facts that, prior to November 1, when the contract was signed, Mrs. Chapman had no conversation with Virnstein, and that Mrs. Chapman's name was not on the escrow account in which the $20,000 was deposited. However, as Judge Dorsey pointed out in his second opinion, that check was made payable to both Mr. and Mrs. Chapman. Moreover, the $55,000 deposited in the escrow account was the proceeds of a loan made to both the Chapmans, made in large part to make the payment on the Ford mortgage. Mrs. Chapman has benefited from the transactions; the written contract for the sale of the Western Auto property shows both Chapmans as the sellers. A husband may act as agent for his wife in real estate trans-

actions. *Duck v. Quality Custom Homes, Inc.*, 242 Md. 609, 614-15, 220 A. 2d 143 (1966), and cases therein cited. In this case, there is strong evidence of such an agency. We find no error in the court's ruling that Mrs. Chapman is liable to the Fords to the same extent as is her husband.

The appellants contend that there was no evasion of any of their obligations under the mortgage, because neither Chapman nor Virnstein had an enforceable contract against the other either at law or in equity and because the terms of the mortgage gave the Chapmans the express right to make prepayments of the principal at any time without the imposition of a penalty. They do not contest the fact that, under the terms of the mortgage, a sale of the property would have made the remainder of the indebtedness due and payable, with an additional sum of ten percent, but claim that, even if it was intended that a sale would eventually take place after the prepayment of the $55,000, no additional sum was due on that payment because at that time there was no contract of sale by Chapman enforceable against him. In our judgment, the contention ignores the clear intent of the terms of the mortgage from the Chapmans to the Fords and cannot prevail under the legal principles applicable to the factual situation here presented.

The mortgage is not only a security instrument, it is also a contract between the parties. It is in the province of the court to determine if the agreement is susceptible of a clear and definite understanding and, if so, to state the clear meaning. We find the contract clear on the point here involved, and its construction is therefore a matter for judicial interpretation. *Rothman v. Silver*, 245 Md. 292, 226 A. 2d 308 (1967); *Keyworth v. Industrial Sales Co.*, 241 Md. 453, 456, 217 A. 2d 253 (1966), and cases therein cited. The clear intent of the agreement, as we read it, is that the Fords, the morgagees, wished to have the indebtedness protected by the ownership interest of the Chapmans, the mortgagors; if the property was sold, that interest terminated, even though the contract of sale was not then consummated. On a sale, the balance of the indebtedness was accelerated, and the additional payment of ten percent was to be added. We assume, *arguendo*, that if no sale had been made, no additional sum would have been due on a partial pre-

payment, but when there was a definite contract of sale, as we have found there was, the right to make the prepayment without penalty became immaterial, because the clear intent and effect of the agreement was that, on a sale, the entire principal became due with the additional ten percent thereon.

The word "sale" as contained in the mortgage is not limited to a sale enforceable between the parties thereto. Assuming, without deciding, that the oral contract of sale between Chapman and Virnstein was within the Statute of Frauds and therefore not enforceable as between them, see *Bauer v. Hamill,* 188 Md. 553, 566, 53 A. 2d 399 (1947), the contract was nevertheless not without legal effect as to third parties. The Fords were not parties to the contract and, for the reasons which follow, the Chapmans cannot take advantage of the unenforceability as a defense to their breach of their contractual obligations to the Fords.

It is generally accepted that third parties cannot assert the Statute of Frauds as a defense to an action against them by the direct parties to a contract. Restatement, *Contracts* § 218;[2] *Corbin, Contracts* §§ 279, 289. See *Cumberland Glass Mfg. Co. v. DeWitt,* 120 Md. 381, 388, 87 Atl. 927 (1913), aff'd, 237 U. S. 447 (1915); *Texeramics, Inc. v. United States,* 239 F. 2d 762, 764 (5th Cir. 1957); *Russell v. Keene,* 394 S. W. 2d 131, 132 (Ark. 1965); *Linse v. O'Meara,* 338 Mass. 338, 155 N. E. 2d 448, 451 (1959). The Statute of Frauds is a shield, not a sword. The reason for this principle is that the Statute is intended to prevent fraud by one of the contracting parties on the other; if those parties recognize the efficacy of the contract, the protection of the Statute is unnecessary, and the legal relations created by the contract between the parties to it and third persons, although technically unenforceable, can be given effect without violating the protection of the Statute.[3] On the

---

**2.** "Only a party to a contract or the successor of a party or one to whom the rights of a party are transferred or contracted to be transferred can assert that the contract, because of non-compliance with the Statute, has not the same effect as if its requirements were satisfied."

**3.** "A contract where the parties have not complied with the statute is neither void nor voidable; it has much effect upon the

same rationale, parties to an agreement should not be able to assert its technical unenforceability as a defense to a suit by a third party.

In the present case, the Chapmans never invoked the Statute as a defense to the performance of their contract with Virnstein which was actually made on October 18 although the formal agreement was not signed until about two weeks later. Judge Dorsey found that the delay in entering into the written contract was only an attempt by the Chapmans to evade the penalty clause of their mortgage agreement with the Fords. That conclusion is strongly supported by the record. The appellants argue that what they did may have been an avoidance of the penalty but was not an illegal evasion. Justice is not so blind.

In *C-E-I-R, Inc. v. Computer Dynamics Corp.,* 229 Md. 357, 183 A. 2d 374 (1962), Grillo, one of the appellees, had entered into an employment contract with C-E-I-R Inc., the appellant corporation, under which he agreed not to use data relating to his work in competition with his employer during or after his employment. Grillo and other employees secretly formed a competing corporation, resigned from C-E-I-R, and, on the basis of confidential information acquired while in the employ of C-E-I-R, competed with that company after their resignations. This Court held that the appellant was entitled to the injunction it prayed and also to damages. The decision rested on breaches of both fiduciary and contractual obligations. Judge Sybert, for the Court, said, at 229 Md. 367-68: "Because of the secret plans of the appellees to become competitors for this same business, an unfair situation was created whereby they were able to absorb this unique experience and solidify their contacts with Bureau officials on C-E-I-R's time and at that company's expense, and to use these advantages later as planned for the benefit of a competing corporation." C-E-I-R involved a different subject matter, and was a suit in equity rather than an action at law. There were other grounds for the decision,

---

legal relations of the contracting parties with each other and with third persons * * * It creates legal relations between the contractors and third persons in many respects identical with those created by completely valid contracts * * *" Corbin, Contracts § 279.

but, *inter alia,* the case exemplifies the legal principle that a violation of a duty is no less a breach because its consummation is purposefully delayed in an attempt to evade the legal consequences of its actual perpetration. To the same effect, see *Community Counseling Service, Inc. v. Reilly,* 317 F. 2d 239 (4th Cir. 1963) ; *American Window Cleaning Co. v. Cohen,* 343 Mass. 195, 178 N. E. 2d 5 (1961) ; *Byrne v. Barrett,* 268 N. Y. 199, 197 N. E. 217 (1935).

The appellants' remaining· contentions require little discussion. They argue that the word "property" in the mortgage means all the mortgaged security, and therefore the sale of one of the two remaining parcels was not a sale of the "property". The term "property" as used in the mortgage is to be interpreted according to what reasonable persons in the position of the parties would have thought it meant. *Keyworth v. Industrial Sales, supra,* at 241 Md. 456-57, and cases therein cited. Three parcels of real estate were pledged as security for the obligation under the mortgage and we think that reasonable parties in the position of the mortgagees and mortgagors must be taken to have meant that "property" was used generically, in the sense that the reference to the whole includes each of the parts. The Western Auto property was worth more than the amount of the original indebtedness. Chapman recognized that this property could not be sold without accelerating the whole indebtedness and incurring the additional payment in his interview with Ford before the sale was made. If there were an ambiguity, we feel justified in adopting the interpretation given to the contract by the parties themselves. *Gallagher's Estate v. Battle,* 209 Md. 592, 604, 122 A. 2d 93, *cert. denied,* 352 U. S. 894 (1956).

The argument of the appellants that the Fords waived the additional payment provision because they accepted the proceeds· of the sale of the Physic Hill property without the additional ten percent is also without merit. Ford's testimony that he waived the additional payment only to help the Chapmans is uncontradicted. The relinquishment by the Fords of their right to collect the penalty in a prior transaction is not inconsistent with their intention to assert their rights in a subsequent transaction, and does not justify an inference that they had relinquished

such rights. *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 531-32, 200 A. 2d 166 (1964).

We hold that the court below did not err in denying the appellants' motion and that its decision on the merits on the conclusion of the testimony is supported by the evidence and the legal principles applicable thereto.

*Judgment affirmed; costs to be paid by appellants.*