Hazel CRUIKSHANK, Plaintiff-Appellee,

v.

Don HORN, Wesley Greene, and Kelly Piper, Defendants-Appellants.

No. 85–514.

Court of Appeals of Iowa.

Jan. 29, 1986.

Vern M. Ball, Bloomfield, for defendants-appellants.

Kenneth L. Keith and Lloyd E. Keith of Dull, Keith & Beaver, Ottumwa, for plaintiff-appellee.

Heard by DONIELSON, P.J., and SCHLEGEL and SACKETT, JJ.

DONIELSON, Presiding Judge.

Defendant-auctioneers appeal from judgment for plaintiff-seller in an action for an accounting of auction proceeds, asserting: (1) that auctioneers should not bear the loss resulting from failure of the bank in which the proceeds were deposited and that the risk of the bank's failure was unforeseeable; (2) that the evidence was sufficient to establish a custom to which they conformed; and (3) that the evidence was insufficient to establish the existence of a confidential relationship between the parties.

Plaintiff, Hazel Cruikshank, hired defendants (Horn) to conduct a farm auction on September 3, 1983. The parties agreed Horn would advertise the sale and that the sale was to be for cash, which meant currency and good checks. The specific manner of distributing sale proceeds was not discussed. Horn placed the proceeds in a bank account entitled "Hazel Cruikshank Sale—Don Horn, Clerk" from which their fees and other sale expenses were paid on September 6, 1983 (the first day the bank was open after the auction). The remaining funds were mailed to Cruikshank on September 14th in the form of a check which was not honored due to closure of the bank for insolvency on September 13th.

In Cruikshank's equitable action for an accounting, evidence was presented concerning the extent of Cruikshank's reliance on Horn and the degree to which his actions were in conformity with the custom of auctioneers in the area. The trial court noted Horn admitted in the pleadings Cruikshank employed Horn to act on her behalf to conduct an auction; that Horn stood in a fiduciary relationship to her, and owed her duties of good faith, loyalty, and honesty; that the proceeds of the sale came into the hands of Horn for safekeeping, and Horn had a duty to pay over the proceeds of the sale to Cruikshank less any proper expenses attributable thereto. It also determined Horn knew the bank he deposited the funds in was not insured under federal law. The trial court also concluded no uniform custom existed for the handling of proceeds by auction clerks in the community. Judgment was entered for Cruikshank.

## I.

This case basically involves the issue of who should be responsible for funds deposited in a bank which has become insolvent: The auctioneer/clerk who claims proceeds are routinely placed in such an account for seven to ten days to allow checks to clear and that no reason existed to believe the bank would become insolvent, or the seller who claims she was entitled to the proceeds immediately after the sale, absent a contrary arrangement.

Our scope of review in this equity case is de novo. Iowa R.App. P. 4. In such cases, especially when considering the credibility of witnesses, the court gives weight to the fact findings of the trial court, but is not bound by them. Iowa R.App. P. 14(f)(7).

■ It is well-settled that:
As the relationship between an auctioneer and one for whom he undertakes to conduct an auction is purely contractual, the nature and extent of his liability to the vendor depend in each instance upon the terms of the particular contract exist-

ing between them. For a failure to live up to the terms thereof and to carry out the instructions of his employer, he is answerable in damages the same as any other agent. He is also personally responsible for any loss that is a consequence of his negligence—that is, his failure to use ordinary care and skill in the performance of the duties confided to him.

\* \* \* \* \* \*

Obviously, it is the duty of the auctioneer to turn over the proceeds of a sale to his employer. . . .

7 Am.Jur.2d *Auction and Auctioneers* § 65 (1980). We have little difficulty adopting the principles embodied in the previous authority, however, the unresolved question is *when* must the proceeds be turned over.

Iowa authority involving an insolvent bank and a clerk of sale for an auction who converted the sellers' proceeds for his own use provides guidance by stating:

There can be no doubt under the authorities that an agent [clerk of sale for an auction], who collects funds of his principal [sellers of goods at auction], holds such funds as a trustee and that the title thereof rests in the principal and not in the agent. It is equally true that an unauthorized disposition of the funds by the agent does not divest them of their trust character except where the rights of third parties without notice become involved. Under the record in this case the duty of the agent to turn over the proceeds to his principal had fully matured long prior to December 26, the date of the receivership.

*Andrew v. Northwest Davenport Savings Bank,* 217 Iowa 780, 782, 253 N.W. 133, 134 (1934). The court in *Andrew* held that immediately after the auction which was held on December 8 and, later, on December 9 or 10, the clerk of sale for the auction used all the proceeds of the sale to purchase a cashier's check made payable to himself. The agent was held to have converted the proceeds in bad faith because he did so without the knowledge, consent or subsequent ratification of his principal. *Id.* at 786.

Moreover, in *McKey v. Erbes,* 187 Iowa 609, 614, 174 N.W. 372, 374 (1919), a case involving an auctioneer who exceeded his scope of authority, the court held:

The argument by Erbes [the seller] is that Tauber, as auctioneer, had no authority to extend credit, and that, therefore, his principal was not bound to recognize the bid. The argument is based wholly upon the law of the auction. It is assumed that the relations between Tauber and Erbes were strictly that of an auctioneer to his principal. The auctioneer represents a class of agency. The law defining his authority and duty is quite well settled. The contract between these parties, however, involves more than the relation of principal and auctioneer. The contractual undertaking of Tauber & Company went beyond that of an auctioneer. By their contract, they assumed full control of the property in advance of the sale, for the purpose of assortment and preparation, and they bound themselves to collect the purchase money and to pay the same to the use of Erbes within 10 days following the sale. These were obligations which would not be created by their employment as mere auctioneers.

The terms of the agreement between Cruikshank and Horn indicate that no specific instruction was provided as to how the proceeds were to be handled. At trial, Horn attempted to show Cruikshank consented to having the proceeds placed in a bank account; however, the trial court specifically found by observing witness credibility that Cruikshank did not agree to having her proceeds placed in a bank account.

Thus, as distinguished from *McKey* where additional contract terms altered the auctioneer-seller relationship, no such contractual terms exist here. The agreement between Cruikshank and Horn did not go outside the relation of principal and auctioneer so that Cruikshank cannot recover on a contract theory. Consequently, Cruik-

shank can only recover pursuant to agency principles.

Given that a principal-agent relationship existed, Horn attempted to establish his actions were consistent with the practice and custom of the community. This evidence was offered to show Horn did not breach his fiduciary duties. The trial court found, and we agree, that Horn, while his actions were not atypical, did not establish that only one custom existed in the Davis County community.

The custom and practice of auctioneers was hotly disputed because it bears on the appropriateness of Horn's actions. Horn maintains that in the absence of specific instructions, an agent is to act in accord with custom or, in the alternative, if no custom exists an agent can act in a manner which is not uncommon to do. *See* Restatement (Second) of Agency, § 35 comment d (1958).

Horn's contentions miss the mark because even if proceeds are routinely placed in a bank account, the issue is not whether depositing the proceeds in this particular bank exhibited poor judgment, but rather the issue is whether he should have informed Cruikshank he intended to take such action and obtained her consent. We do not find Horn's actions in depositing the proceeds were necessarily wrongful; however, his inaction or failure to disclose to Cruikshank his actions without her consent was culpable. Whether or not Horn could foresee the bank would become insolvent is not relevant. The relevant determination is whether Horn acted outside his scope of authority by not disclosing to his principal that he intended to deposit the proceeds in *any* bank.

It is generally acknowledged that:

The duty of an agent to make full disclosure to his principal of all material facts to the agency is fundamental to the fiduciary relation of principal and agent. It is a primary incident of the obligation of an agent that he make a prompt, full, and frank disclosure and account of all matters concerning the agency, and he must give the principal any information

that the latter would desire to have and which can be communicated to him without violating a superior duty to a third person.

3 Am.Jur.2d, *Agency* § 200 (1962). *See also* Restatement (Second) of Agency §§ 381 (1958) ("Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person."); *C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 183 A.2d 374 (1962); *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962).

■ It is further recognized that "if, at the time of acting, the agent should realize the possibility of conflicting interpretations, ordinarily he is not authorized to act, since it would be his duty to communicate with his principal and obtain more definite instructions." Restatement (Second) of Agency § 44 comment c (1958). This authority leads us to conclude the auctioneer had a duty to inform the seller exactly how the proceeds would have been handled. It is clear that Horn's handling of the proceeds in his customary manner was done in good faith, however, Horn was remiss in that he could reasonably be expected to disclose to *all* his customers how proceeds would be handled after completion of the auction. Cruikshank did not know the proceeds would be deposited in a bank nor did she instruct Horn to deposit the proceeds in a bank. Although Cruikshank admitted no specific instructions were given, the auctioneer, as the party most familiar with such transactions, had a duty to disclose all aspects of the auction and clerking duties.

■ Even if Horn assumed Cruikshank knew he would deposit the proceeds in a bank account, such an assumption is not warranted. Testimony was introduced that several clerks of sale for auctions in the Davis County area discuss with sellers the manner in which proceeds will be handled *before* the auction. Given that proceeds

can be handled in a variety of ways, it is not an onerous duty to place on a clerk of sale for an auction to have the seller consent to how the proceeds will be handled. Had Cruikshank simply been informed of and consented to the manner in which Horn handled the proceeds, our result may well have been different. Because Horn breached his fiduciary duty to disclose all relevant information, i.e. how the proceeds would be handled, and did not obtain Cruikshank's consent to depositing them in a bank, Horn acted outside the scope of his authority.

Horn directs us to authority, *In re Estate of Wiese*, 257 N.W.2d 1 (1977); *In re Estate of Workman*, 196 Iowa 1108, 196 N.W. 35 (1923), involving the standard of care regarding investments by a fiduciary. While we do not find Horn acted imprudently by his choice of banks to deposit the proceeds, Horn's actions in not disclosing how he was going to handle the proceeds in the first place is problematic. The authority cited by Horn is inapposite because in each instance the fiduciary in those cases had obtained the consent to invest the funds; not whether the fiduciary could invest the funds at all. Finally, we are not unmindful of the fact that Horn, as a fiduciary, deposited the checks to allow checks to clear so as to avoid assuming the risk of a bad check. It appears that Horn personally benefited from depositing the checks in this account for clearing outstanding checks. Therefore, it is reasonable to hold the fiduciary, Horn, accountable for the safekeeping of his client's funds while in his possession.

## II.

■ Horn also claims the trial court erred in finding a confidential relationship between Cruikshank and Horn existed. Horn submits he did not obtain any benefit from depositing the proceeds as he did nor did he have any direct influence over Cruikshank to establish a confidential relationship.

Iowa authority on this subject provides:

A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. Fiduciary relations include not only the relation of trustee and beneficiary, but, also, among others, those of guardian and ward, agent and principal, attorney and client. Although the relation between two persons is not a fiduciary relation, it may, nevertheless, be a confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or one of friendship or such relation of confidence as that which arises between physician and patient or priest and penitent.

*Merritt v. Easterly*, 226 Iowa 514, 517–18, 284 N.W. 397, 399 (1939). In *Merritt*, the person who gained the confidence was the decedent's nephew who eventually lived in the decedent's house and helped her in business matters in much the same manner as a guardian. The court had little difficulty in finding both a fiduciary and a confidential relationship existed [1] and stated the confidential relationship existed "because she had abiding faith and trust in him, and relied upon him to advise and act with her interest only in mind." *Id.* at 530, 284 N.W. at 405.

In a later case, the Iowa court stated:

We have been slow to define the precise limits of a confidential relationship. It is clear it may exist although there is no fiduciary relation. As Restatement,

---

1. Horn contends the trial court only found a confidential relationship existed in this case and not that a fiduciary and confidential relationship existed. We disagree. The trial court stated: "It is undisputed that a fiduciary relationship existed between the defendants and plain-

tiffs. It also appeared that the evidence shows that a confidential relationship existed between the defendants and plaintiff." The trial court immediately after this quote discussed *Merritt v. Easterly*, which leads us to conclude the trial court held for plaintiff on both grounds.

Trusts, section 2, comment b, says, it exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. It does not arise solely from blood relationship such as between parent and child. The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. Purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence.

*Groves v. Groves*, 248 Iowa 682, 693, 82 N.W.2d 124, 131 (1957).

While the person in *Groves* who was alleged to have exerted the dominant influence was the son of the decedent and their filial relationship was close due to their daily contact, testimony indicated that on three relevant business matters the decedent did not once follow her son's advice. Thus, the court held that a confidential relationship was not shown under the facts.

We do not need to address the claim of "no benefit" being derived from depositing the proceeds because we do not find that the relationship in this case rises to the level of a confidential relationship. Cruikshank hired Horn because her deceased husband had known Horn for many years. No doubt Cruikshank trusted him. However, she *hired* him to run an auction. She did not seek his advice on any other business matters. In fact, she relied on her son, Lowell, for business advice. Lowell assisted his parents in their farming operations and was present when Horn discussed the auction with his mother. It appears that if Mrs. Cruikshank relied upon anyone in a confidential relationship, it was Lowell, not Horn.

We are unwilling to hold that the seller-auctioneer relationship presented in this case constituted a confidential relationship. Cruikshank paid Horn for his services in the only business matter she entrusted to him—the auction. The fact he was a family friend and she completely trusted him *to conduct the auction and pay her the proceeds* is insufficient evidence to establish a confidential relationship. Cruikshank was entitled to rely upon Horn as a fiduciary within the scope of the agency relationship but not under a confidential relationship.

The decree of the trial court is affirmed.

AFFIRMED.

SCHLEGEL, J., concurs.

SACKETT, J., specially concurs.

SACKETT, Judge (specially concurring).

I concur with the result.