**REHABILITATION SPECIALISTS, INC., Appellant,**

v.

**Nancy J. KOERING, Respondent.**

**No. C3-86-1897.**

Court of Appeals of Minnesota.

April 21, 1987.

Keith A. Queensen, Minneapolis, for appellant.

R. Craig Wildfang, Barbara Buhr Gilmore, Minneapolis, for respondent.

Heard, considered and decided by POPOVICH, C.J., and SEDGWICK and CRIPPEN, JJ.

## OPINION

SEDGWICK, Judge.

Rehabilitation Specialists, Inc. ("RSI") appeals from a summary judgment for Nancy Koering, an ex-employee who started a competing business, on its suit for breach of her duty of loyalty, as well as unfair competition and misappropriation of confidential business information. We reverse and remand for trial.

## FACTS

RSI provides physical therapy, occupational therapy and related therapy services to health care facilities in Minnesota and several other states. In 1982, RSI hired

Koering as its director of occupational therapy. In January, 1984, Koering was promoted to assistant administrator, and in November, 1984, she was promoted to administrator. Koering's responsibilities included soliciting business and negotiating contracts for RSI.

In May, 1985, Koering considered starting her own therapy business. On June 13, 1985, she told this to Robert Schuchman, vice-president of operations for Beverly Enterprises ("Beverly"), a company which owns and operates over 1200 long-term care facilities nationally. Beverly is one of RSI's major customers. Schuchman dealt almost exclusively with Koering while she was at RSI.

Koering described her June 13 meeting with Schuchman in an answer to an interrogatory, as follows:

Nancy informed Mr. Schuchman that she was thinking about beginning her own business and inquired about possible opportunities for contracting for new business.

Her affidavit states that during the meeting they

generally discussed the likelihood of success for my business. At no time during our conversation did I inquire about any specific contracts with Beverly. I did not attempt to solicit any business from Beverly nor did I encourage Beverly to break any of its present contracts with RSI.

Schuchman's affidavit describes the meeting like this:

Nancy Koering * * * informed me that she was thinking about beginning her own therapy business. I offered my encouragement and informed her that there would probably be some new contracting opportunities available with Beverly.

At no time during our conversation did Nancy Koering suggest that Beverly sever its ties with RSI and divert its business to her.

After this meeting, Schuchman contacted Koering and told her that, if she began her own business, Beverly would offer her two nursing home contracts, with the Bloomington and Lake Ridge nursing homes. A few weeks later, Schuchman again contacted Koering and offered her contracts with three additional facilities: the Excelsior Health Care Center, the Long Lake Nursing Home and the Hillcrest Health Center.

In a letter dated July 23, 1985, Koering wrote to Schuchman:

I will be meeting with my bank within the next week. It would be advantageous to be able to present the contracts for Bloomington and Lake Ridge and a letter of intent concerning Excelsior, Long Lake and Hillcrest. For this reason I have enclosed contracts for Bloomington and Lake Ridge in Beverly format. * * *

I am prepared to resign July 31 and will look forward to beginning in Bloomington September 1.

At the time Schuchman made his offers to Koering, RSI did not have contracts with any of the five facilities (although it had contracted with Excelsior and Long Lake in the past). Koering's affidavit states that the Bloomington contract was executed on July 31, 1985, to be effective September 1, 1985; the Lake Ridge contract was not executed until after she left RSI; and the other three contracts were not negotiated or executed until after she left RSI. The record indicates that Koering signed the Bloomington contract at a so-called "50 percent fee for service" rate.

Koering and RSI's president, Jeffrey Anlauf, had previously negotiated, on behalf of RSI, with Beverly for the Bloomington contract and others. Her affidavit states:

Beverly offered the contracts to RSI at a 50 percent fee for service rate but Jeffrey Anlauf rejected this offer. He then directed me to inform Beverly that RSI was not willing to accept the contracts at a rate less than 65 per cent for two specific homes and 60 per cent for the remaining two homes. Beverly was unwilling to agree to RSI's terms and awarded the contracts to another therapy service provider.

Anlauf's affidavit states that he never rejected the Bloomington contract, or any of the other four contracts secured by Koering, and that RSI desired the Bloom-

ington contract and would have wanted the others as well. At his deposition, he testified that he had instructed Koering to offer to do all of Beverly's contracts for 50 percent.

On July 26, 1985, Koering notified Anlauf that she intended to leave RSI to begin her own therapy business, and that she believed she would have five therapy contracts. They discussed the possibility of her conducting her business using RSI's offices and staff, for a six percent management fee; she later declined the offer. Anlauf testified he did not know then that Koering's five contracts were with Beverly.

Koering ended her employment with RSI August 31, 1985. She did not have a written employment contract with RSI, nor had she signed a covenant not to compete.

Prior to leaving, Koering filed corporate documents for her new business, met with a bank to obtain financing and applied for business insurance. When she left RSI, she took with her the sole copy (according to Anlauf) of its policy and procedure manual, a list of its employees and several sample contracts. Two of the first three employees she hired left RSI to work for her; the third had stopped working at RSI approximately one year earlier.

RSI sued Koering alleging: breach of her duty of loyalty as an employee, unfair competition and misappropriation of confidential business information. The trial court granted Koering's motion for summary judgment on all three grounds.

## ISSUE

Did the trial court err in granting summary judgment for respondent on appellant's claims for breach of duty of loyalty, unfair competition and misappropriation of confidential business information?

## ANALYSIS

1. *Standard of Review.*

On appeal from a summary judgment, we determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *E.g., Betlach v. Wayzata Condomin-*

*ium*, 281 N.W.2d 328, 330 (Minn.1979). The evidence must be viewed in favor of the party against whom summary judgment was granted. *Abdallah, Inc. v. Martin*, 242 Minn. 416, 424, 65 N.W.2d 641, 646 (1954). All doubts as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment. *Dalco Corp. v. Dixon*, 338 N.W.2d 437, 441 (Minn.1983).

While a trial court has considerable discretion in granting summary judgment, "great care should be exercised * * * so as to permit a litigant to have a right to a trial if there is a reasonable doubt as to the facts." *Abdallah*, 242 Minn. at 424, 65 N.W.2d at 646.

> Summary judgment is a "blunt instrument" and should not be employed to determine issues which suggest that questions be answered before the rights of parties can be fairly passed upon. It should be employed only where it is perfectly clear that no issue of fact is involved, and that it is not desirable nor necessary to inquire into facts which might clarify the application of the law.

*Donnay v. Boulware*, 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966).

2. *Duty of Loyalty*

RSI alleges that Koering violated the implied common law duty of loyalty in her oral employment contract by soliciting customers and employees for herself while still employed by RSI.

An employee's duty of loyalty prohibits her from soliciting the employer's customers for herself, or from otherwise competing with her employer, while she is employed. *See, e.g., Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W.2d 42 (1961). Employees who wish to change jobs or start their own businesses, however, should not be unduly hindered from doing so. *See, e.g., Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 568–69 (1978). An employee has the right, therefore, while still employed, to prepare to enter into competition with her employer. *See Sanitary Farm Dairies*, 261 Minn. at 175–76, 112 N.W.2d at 48–49; *see*

also, e.g., *Auxton Computer Enterprises, Inc. v. Parker*, 174 N.J.Super. 418, 416 A.2d 952, 955–56 (App.Div.1980).

■ There is no precise line between acts by an employee which constitute prohibited "solicitation" and acts which constitute permissible "preparation." *See, e.g., C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 183 A.2d 374, 379 (1962). Because of the competing interests, the actionable wrong is a matter of degree. *Cudahy Co. v. American Laboratories, Inc.*, 313 F.Supp. 1339, 1346 (D.Neb. 1970). Whether an employee's actions constituted a breach of her duty of loyalty is a question of fact to be determined based on all the circumstances of the case. *See Sanitary Farm Dairies*, 261 Minn. at 175, 112 N.W.2d at 48; *Maryland Metals*, 382 A.2d at 570 (determination "must be grounded upon a thoroughgoing examination of the facts").

The trial court found that Koering did not breach her duty of loyalty to RSI because while she "did discuss her intention to leave, she did not solicit the plaintiff's customers."

■ Even if the characterization of her conduct as passive were accurate, it would not necessarily shield her from liability. *See Community Counselling Service, Inc. v. Reilly*, 317 F.2d 239, 244 (4th Cir.1963) ("If prospective customers undertake the opening of negotiations which the employee could not initiate, he must decline to participate in them.")

■ We believe a fact issue exists as to whether her conduct crossed the line from preparation to solicitation. Koering admits she told RSI's customer "she was thinking about beginning her own business and *inquired* about possible opportunities for contracting for new business." (Emphasis added.) While still employed by RSI, she tentatively secured five contracts from him. She sent him two draft contracts and requested letters of intent regarding the three others. Viewed most favorably to RSI, the evidence cannot fairly be characterized as establishing as a matter of law

that Koering did not solicit this customer in violation of her duty of loyalty to RSI.

The fact that RSI did not have contracts with the five facilities Koering contracted for does not preclude a finding that she was competing with her employer in violation of her duty of loyalty. Beverly was a customer of RSI, and it was Koering's duty to attempt to secure additional contracts from it for RSI, not for herself. *See, e.g., C–E–I–R*, 183 A.2d at 379 (solicitation of future business breach of duty despite absence of contract between employer and customer).

Koering's affidavit states that RSI would not have accepted the five contracts had they been offered to it on those terms. Anlauf denies, by affidavit and deposition, that he would have rejected them. Even assuming that Koering would be permitted to solicit contracts that RSI was unwilling to sign, whether that happened is an issue of fact.

Koering only disclosed to Anlauf that she was going to start her own business after she believed the five contracts were secured. By that time, her conduct could be considered to have been unlawful solicitation *See Cudahy Co.*, 313 F.Supp. at 1346 ("Even if there has been a revelation after the fact the employee would probably still be liable.").

Since we hold that the trial court erred in dismissing the first count of RSI's complaint based on Koering's alleged solicitation of its customer, it is unnecessary to address RSI's allegations about her solicitation of its employees.

### 3. *Unfair Competition.*

Count two of RSI's complaint charges Koering with unfair competition, based on the same facts alleged in its first count for breach of contract, *i.e.*, her solicitation of RSI's customers and employees.

■ Unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests. W. Prosser and W. Keeton, *The Law of Torts* § 130, at 1015 (5th ed. 1984); *see*

*also, e.g., United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 632 (Minn.1982) (stating unfair competition can be based on tortious interference with contract or improper use of trade secrets).

■ An employee's breach of his duty of loyalty may constitute unfair competition. *See Sanitary Farm Dairies,* 261 Minn. at 176–177, 112 N.W.2d at 49 (characterizing defendant's conduct in soliciting his employer's customers and failing to give sufficient notice of his intention to quit as "unfair competition"); *Loxtercamp, Inc. v. Belgrade Cooperative Association,* 368 N.W.2d 299, 301 (Minn.Ct.App.1985) (stating that plaintiff "would normally be entitled to such relief as would mitigate the consequences of [defendant's] unfair competition, i.e., the solicitation of several customers prior to his resignation").

Since we hold that there is an issue of fact as to whether Koering solicited RSI's customer in violation of her duty of loyalty, she is not entitled to summary judgment on RSI's unfair competition claim.

### 4. *Misappropriation of confidential information.*

Count three of RSI's complaint alleges Koering misappropriated certain confidential business information.

Minnesota has adopted the Uniform Trade Secrets Act, which provides a cause of action for "misappropriation" of "trade secrets." The statute defines trade secrets as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn.Stat. § 325C.01, subd. 5 (1986); *see also Jostens, Inc. v. National Computer Systems,* 318 N.W.2d 691, 698 n. 4 (Minn. 1982).

Koering admits having taken from RSI its policy and procedures manual. Anlauf states in his affidavit:

The manual was prepared by a committee of RSI employees who spent numerous hours over an extended period of time drafting a manual designed to fulfill the needs of a company involved in the provision of rehabilitation therapy services. * * * [T]he cost of preparing this manual to RSI was over $20,000.

* * * [T]he value this manual would confer upon a competitor is substantial. As a result, only one copy of the working draft was printed, which Nancy Koering took with her without permission. * * * Great efforts are made to keep this document confidential and its distribution limited. * * * [T]he first page of the manual indicates that distribution of this manual is controlled and that "manuals must be returned upon termination." * * * RSI's offices are * * * secure and important documents such as this are frequently stored in locked employee offices within our main office area and are, at times, also locked within lockable furniture in my office.

Although she argues that the manual is not protected because it was a form purchased from a company, Koering admits "the management staff of RSI changed the form to meet RSI's needs," at Anlauf's direction.

Koering also argues there was no "misappropriation" of confidential information because there is no evidence that she actually "used or disclosed" any of the items she took. The trade secrets act, however, defines "misappropriation" as the "*acquisition* of a trade secret of another by a person who knows * * * the trade secret was acquired by improper means." Minn. Stat. § 325C.01, subd. 3(i) (emphasis added). It defines "improper means" as including "theft" or "breach * * * of a duty to maintain secrecy." *Id.,* subd. 2.

The act also provides for injunctive relief against "threatened misappropriation" of trade secrets. Minn.Stat. § 325C.02(a). It

defines "misappropriation" alternatively as the "use of a trade secret of another without * * * consent by a person who used improper means to acquire knowledge of the trade secret." Minn.Stat. § 325C.01, subd. 3(ii)(A).

■ The evidence raises issues of fact as to whether the manual was a "trade secret" and whether it was acquired by "improper means." We need not address RSI's other allegations about misappropriation of confidential information, or its allegation the trial court should have allowed it to supplement its response to Koering's summary judgment motion.

## DECISION

Koering is not entitled to summary judgment on RSI's claims for breach of her duty of loyalty, unfair competition and misappropriation of confidential information.

Reversed and remanded.