The STATE of Minnesota, by Hubert H. HUMPHREY III, its Attorney General, and Blue Cross and Blue Shield of Minnesota, Respondents,

v.

PHILIP MORRIS INCORPORATED, et al., Appellants,

B.A.T. Industries, p.l.c., Appellant,

British–American Tobacco Company Limited, et al., Appellants,

Liggett Group, Inc., Defendant.

Nos. C2–99–885, C4–99–886 and C6–99–887.

Court of Appeals of Minnesota.

Feb. 22, 2000.

Review Denied April 25, 2000.*

* PAGE, PAUL H. ANDERSON, GILBERT, and LANCASTER, JJ., took no part in the consideration or decision of this case.

Michael V. Ciresi, Roberta B. Walburn, Gary L. Wilson, Vincent J. Moccio, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, for respondents.

James S. Simonson, Dean A. LeDoux, Jonathan M. Redgrave, Gray, Plant, Moo-

ty, Mooty & Bennett, P.A., Minneapolis, for appellant R.J. Reynolds.

Kenneth S. Geller, Mayer, Brown & Platt, Washington, DC; and Peter W. Sipkins, Paul Dieseth, Dorsey & Whitney, Minneapolis, for appellant Philip Morris Incorporated.

R. Lawrence Purdy, Maslon, Edelman, Borman & Brand, Minneapolis, for appellant Council for Tobacco Research.

David G. Martin, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, for appellant Lorillard Tobacco Co.

George W. Flynn, Hal Shillingstad, Cosgrove, Flynn, Gaskins & O'Connor, Minneapolis, for appellant Tobacco Institute.

Byron E. Starns, John W. Getsinger, Leonard, Street and Deinard, P.A., Minneapolis; and Arthur C. Fahlbusch, Jr., Chadbourne & Parke LLP, New York, N.Y. for appellants British–American Tobacco Company Limited and B.A.T. (U.K. and Export) Limited.

Patrick D. Bonner, Jr., Simpson Thacher & Bartlett, New York, N.Y.; and Richard G. Jensen, Fabyanske, Westra & Hart, Minneapolis, for appellant B.A.T. Industries.

Peter J. Smith, Appellate Staff Civil Division, Department of Justice, Washington, DC, for Amicus Curiae United States of America.

Jack M. Fribley, Faegre & Benson LLP, Minneapolis (for appellant Brown & Williamson).

Considered and decided by TOUSSAINT, Chief Judge, LANSING, Judge, KALITOWSKI, Judge, KLAPHAKE, Judge, AMUNDSON, Judge, HARTEN, Judge, and SHUMAKER, Judge.

**1.** Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, The American Tobacco Company, Lorillard Tobacco Company, The Council for Tobacco Research–U.S.A., Inc., and The Tobacco Institute, Inc. ("domestic appellants") make their arguments jointly in one brief. The British tobacco companies ("British appellants"), consisting of the British American Tobacco Company Limited ("BABATCo"), B.A.T. (U.K. and Export) Limited ("BATUKE"), and B.A.T. Industries ("BAT Industries"), made their arguments jointly in another brief. The Liggett Group settled earlier and is not part of this appeal.

## OPINION

TOUSSAINT, Chief Judge

Appellants, domestic and British tobacco companies and tobacco organizations, challenge the district court's decision to lift its earlier protective orders after the completion of litigation and allow public access to certain documents produced during discovery. They argue that the court failed to use the proper standard in reaching its decision to modify the protective orders. Even if the proper standard was used, appellants contend that the district court committed other legal errors bearing on whether disclosure was warranted, including a failure to conduct a document-by-document review of the material subject to claims of attorney-client privilege or work-product doctrine. In any event, they claim that the district court erred as a matter of law in ruling that the disclosure was authorized under the consent judgment. Finally, they contend that the disclosure order constituted a taking of property without just compensation. We affirm, holding that the district court did not abuse its discretion in lifting the protective orders or in deciding discovery disputes and that the disclosure order did not cause a taking without just compensation.

## FACTS

In 1994, the State of Minnesota and Blue Cross and Blue Shield of Minnesota sued domestic and British tobacco companies and tobacco organizations on various theories, seeking injunctive relief and damages for health-care costs related to smoking.[1] On June 16, 1995, the district court issued a protective order allowing the par-

ties to designate discovery documents as confidential based on a good-faith determination that they constituted "a trade secret or * * * confidential, private, or similarly protected information under applicable statutory or common law." It ordered the parties to maintain a document depository, into which all documents produced in the action would be placed. The court warned that the protective order did not create a presumption that the designated documents were confidential and also stated that the order could be modified by the court sua sponte or on motion by the parties for good cause shown. Finally, the order stated that these provisions would remain in effect after the conclusion of the action, and that the court would issue an order addressing the use of confidential materials at trial or at the conclusion of the case.

### 1. 4A Indices

Throughout the pretrial period and during trial, there were numerous hearings, orders, and appeals related to discovery. Respondents sought discovery from the domestic appellants of the 4A indices (named after a paragraph in one of the district court orders), which are litigation databases designed and prepared by appellant's lawyers in preparation for and in response to lawsuits. Domestic appellants describe them as "custom-designed computerized indices, which have cost millions of dollars to create and maintain" and which "contain records of millions of documents culled by lawyers from their clients' files," with "both objective identifying information and subjective analysis and commentary." They asserted that these indices were protected by the work-product doctrine.

In a March 29, 1995, case-management order, the district court ordered all parties to produce any existing indices of documents, along with the documents. It specified that only objective information from the indices need be provided and indicated that any such information arguably pro-

tected by the attorney-client privilege or work-product doctrine need not be included. On July 17, 1995, the court again ordered production of indices and, to the extent there were claims of attorney-client privilege or work-product doctrine, ordered an in camera inspection. It issued a similar order for in camera review on August 10, 1995. The domestic appellants made a motion for permission to present exemplar discs providing samples for review, which the court granted on August 17, 1995.

On November 1, 1995, the court addressed the domestic appellant's claim that the 4A indices constituted protectable work product. First, it found that respondents had demonstrated "substantial need and inability to obtain the equivalent without undue hardship." It ordered objective portions of the indices disclosed, ruling that the "mere selection of documents" would not reveal "counsel's mental impressions, strategies, [or] thought processes" because "[u]nlike identifying a few significant documents out of thousands, the sheer number of documents identified in the indexes at issue provides protection." The court allowed appellants to redact any subjective portions that might reveal protected opinion work product.

The domestic appellants then sought review of the decision by petitioning this court for a writ of prohibition or mandamus. After reviewing material submitted for an in camera review, this court denied the petition, ruling that the district court was "authorized to order discovery of work-product materials under certain circumstances." *State, by Humphrey v. Philip Morris, Inc.*, No. CX–95–2536, 1995 WL 862582, at *1 (Minn.App. Dec.26, 1995). This court also noted that the district court had made specific findings that the "computerized databases include fields containing objective information," whose release would not reveal protected information. *Id.* This court noted that the district court found unpersuasive the argument that "the mere selection of docu-

ments for inclusion in the databases would reveal attorney strategies." *Id.* The Minnesota Supreme Court denied appellants' petition for further review, and the United States Supreme Court denied their petition for a writ of certiorari. *State, by Humphrey v. Philip Morris Inc.*, No. CX–95–2536 (Minn. Feb. 27, 1996), *cert. denied,* 517 U.S. 1222, 116 S.Ct. 1852, 134 L.Ed.2d 952 (1996).

After exhausting appellate remedies, appellants filed another motion in the district court, requesting clarification or modification of the November 1, 1995, order, in an attempt to exclude certain indices or portions of indices from production. On June 7, 1996, the district court issued an order, entitled "Eighth Order Regarding Indices," denying appellants' motion and again ordering them to produce the indices in redacted form. The district court also specified that the indices would be confidential and protected from general dissemination pursuant to the earlier protective order until the court ordered otherwise for good cause shown. In June 1996, domestic appellants produced the 4A indices to respondents.

### 2. Categorization Documents

According to domestic appellants, respondents sought discovery of more than 33,000,000 pages of documents. Appellants asserted attorney-client and work-product privilege[2] as to some 230,000 documents, which are estimated to contain more than 1,000,000 pages.

Briefly, the district court found that respondents had made a prima facie showing that the crime-fraud exception applied, based on appellants' intentional public denial and minimization of health risks con-

nected to smoking. The court, recognizing that it would not be feasible to conduct a document-by-document examination, established a categorical review process. The parties were required to designate categories to which the requested documents belonged according to the privilege claimed. A special master would review a sample of the documents to determine whether the privilege applied to each category. Appellants declined to suggest any categories, deferring to the 14 categories suggested by respondents, which were subsequently adopted by the district court.

The special master began considering appellants' claims of privilege, randomly selecting documents from each category for in camera review. In addition, the parties were afforded the right to select unlimited additional documents from each category for "particularized discussion" in their briefs and at hearings before the special master. Appellants were also permitted to present arguments ex parte and to provide redacted versions of the selected documents to respondents.

After months of review of the documents and written submissions, the special master issued a 165–page report and recommendations on February 10, 1998.[3] The special master recommended that appellants' claims of privilege be sustained for ten of the fourteen categories, but that appellants be required to produce documents from categories 1, 3, 4b, and 5. Of the "39,000" documents in these four categories, "37,000" are from the domestic appellants and "2,000" are from the British appellants.[4]

Category 1 consisted of two kinds of documents. The first group includes documents for which other courts have de-

---

2. Appellants' claim of joint-defense/common-interest privilege relating to defendant Liggett's March 1997 settlement and waiver of all claims of privilege is not at issue in these appeals.

3. The trial had begun on January 20, 1998.

4. The domestic appellants advise this court that, based on their review of these documents for another lawsuit, they continue to assert privilege as to only about 25,000 documents; however, for simplicity, they continue to refer to these as the "37,000" documents. The "2,000" British documents actually consist of 330 B.A.T. Industries documents and 1,938 BATCo and BATUKE documents.

nied claims of privilege or protection. The special master, after sampling these documents, concluded that they were not privileged and/or were closely related to the crime-fraud findings, finding that they related *"directly* to the control or suppression of research, and the creation of privilege shields to conceal possession of dangerous information." In the second group were those documents that appellants specifically selected for "particularized discussion." After conducting a document-by-document review, the special master determined these were not privileged because they involved safety-related scientific research and/or were closely related to crime-fraud.

Next, the category 3 documents included scientific research, memos, or reports on smoking and health. After reviewing a sample, the special master determined that these documents were not privileged or that they were discoverable under the crime-fraud exception or the fact work-product doctrine.

Category 4b contained documents relating to special projects, generally scientific research controlled by tobacco industry attorneys. The special master found these were discoverable under the crime-fraud exception. Finally, category 5 contained documents relating to appellants' public statements on smoking and health, which the special master found were not privileged or were subject to the crime-fraud exception.

On March 7, 1998, the district court, after holding a hearing and allowing additional briefing, adopted the special master's report and recommendations with only minor clarifications. The district court found appellants "claimed privilege for documents which are clearly and inarguably not entitled to protections of privilege." It stated that appellants' "intentional and repeated misuse of claims of privilege is intolerable in a court of law, and an appropriate sanction for such abuse is release of all documents for which privilege is improperly claimed." The district

court found appellants continued to violate various discovery orders of the court and rejected their renewed due-process challenges to the categorization process.

Appellants then sought review of the categorization process from this court. On March 17, 1998, this court denied appellants' petitions for writs of prohibition or mandamus, finding the petitions were untimely and failed to meet the standards for extraordinary relief. *State, by Humphrey v. Philip Morris, Inc.,* No. CX–98–414, 1998 WL 154543 (Minn. Mar. 27, 1998). This court further found appellants had not established that "specific documents are *clearly* not discoverable, that the remedies afforded them are or were inadequate, or that the trial court exceeded its legitimate powers." *Id.* This court also found that appellants failed to establish

> (a) that their opportunity to present argument or evidence in support of claims of privilege was limited or abridged in any significant way; (b) the existence of errors of law in the application of standards governing the crime-fraud exception; or (c) that the detailed findings of the special master are inadequate to support the trial court's order compelling disclosure.

*Id.*

Appellants then petitioned the Minnesota Supreme Court for further review, which was denied on March 27, 1998. *State, by Humphrey v. Philip Morris Inc.,* No. CX–98–414, 1998 WL 154543 (Minn. Mar.27, 1998). The supreme court noted that the district court, in adopting the categorization process, "recognized the virtually unprecedented dimension of discovery and assertion of privilege involved in the case." *Id.* at *1. The supreme court also recognized that the document-by-document review sought by appellants was, "as a practical matter, an impossibility." *Id.* The supreme court noted that its order did not

> address or decide the propriety of the process established by the district court

to deal with the volume of material before it; rather, it does acknowledge the interlocutory nature of the orders at issue and the practical impossibility of the relief sought.

*Id.* The court stated that while many of the documents were discoverable based on the district court's orders:

There remains the inquiry as to the relevancy of these documents and their admissibility—issues which will undoubtedly be carefully considered by the district court.

*Id.*

Appellants petitioned the United States Supreme Court for a stay, which was ultimately denied. *Philip Morris Inc. v. Minnesota,* 523 U.S. 1056, 118 S.Ct. 1384, 140 L.Ed.2d 643 (1998). They then produced the material. In March 1998, Congress subpoenaed the 37,000 documents produced by the domestic appellants and placed all but 39 of these documents on the Internet. Congress did not subpoena or place on the Internet the 2,000 documents produced by the British appellants under the categorization process.

### 3. American Tobacco Sanctions Documents

Next at issue are the 1,114 American Tobacco Company sanctions documents. On May 8, 1997, the district court granted respondents' motion to compel relating to depositions of the American Tobacco Company officials.[5] The court ordered that they provide full answers to specific questions regarding smoking and health research documents and advertising documents and ordered production of these documents. On May 19, 1997, American Tobacco challenged the district court's authority to order it to produce the information. On June 18, 1997, the court found that American Tobacco had willfully violated its May 8 order by failing to produce the documents or answer the questions.

It scheduled a June 24, 1997, sanctions hearing, giving American Tobacco another opportunity to comply.

Rather than complying, American Tobacco sought review from this court, petitioning for discretionary review of and appealing from the June 18, 1997, order and petitioning for prohibition or mandamus to obtain relief from the May 8 and June 18, 1997, orders. This court denied all relief, expressing concern about the "numerous requests for interlocutory review of non-dispositive pretrial rulings in this litigation" and cautioning that it might award attorney fees or sanctions in the future if counsel made frivolous petitions, appeals, or arguments. *State, by Humphrey v. Philip Morris Inc.,* No. C2–97–1109 (Minn. App. July 23, 1997). American Tobacco then petitioned the supreme court for a writ of prohibition and for review of this court's decisions, which the supreme court denied. *State, by Humphrey v. Philip Morris Inc.,* No. C2–97–1109 (Minn. Nov. 13, 1997). Finally, less than ten hours before the scheduled sanctions hearing, American Tobacco filed supplemental responses to the court's May 8, 1997, order, which the district court found to be "incomplete, evasive, and lacking in good faith and due diligence." Consequently, the court ruled that American Tobacco remained in "willful violation" of the court's May 8 and June 18, 1997, orders and concluded that harsh sanctions were warranted. It ordered that all alleged claims of privileges, whether attorney-client or work product, be stricken with respect to the 1,114 documents. It also required American Tobacco to pay costs and expenses incurred by respondents to litigate the discovery abuses and to pay a fine of $100,000 to the court. Congress also subpoenaed these 1,114 documents and placed them on the Internet.

---

**5.** The district court found Brown & Williamson Tobacco Corporation was the successor by merger of the American Tobacco Company. For simplicity, we will continue to refer to that entity as American Tobacco.

### 4. Exhibit 1 Documents

The special master's report of February 10, 1998, recommended that appellants' claims of privileges be stricken for documents relating to addiction and nicotine manipulation based on the crime-fraud exception. Respondents then reviewed appellants' privilege logs, searching for the terms "nicotine" and "addiction." They asserted that they had discovered a pattern in which appellants had misclassified hundreds of relevant documents into categories that the special master was recommending not be produced. Respondents listed 458 documents in exhibit 1 to a motion (hence the denomination "exhibit 1" documents). Thirteen of these were from the British appellants while the rest were from the domestic appellants. The district court referred the matter back to the special master to determine whether the miscategorization was a statistical anomaly. After reviewing a random sample of documents, the special master stated he could not conclude the miscategorization was a statistical anomaly. Based on this finding, on May 1, 1998, the district court struck the claims of privilege as to these 458 documents.

Meanwhile, the trial had begun in January 1998. Shortly before the end of the trial, British appellant BATUKE was dismissed. Before making closing arguments, the domestic appellants and the respondents settled. The court entered a consent judgment on May 19, 1998. Included in the consent judgment was language dissolving the protective orders as to some documents and allowing public access to them and allowing respondents to move for court approval to make other documents available to the public.

Respondents then moved to release the remaining documents and indices at issue here from the protective order and make them available to the public. On November 25, 1998, the district court determined that respondents had shown good cause to lift protective orders as to the documents and indices and that release of the documents was in the public interest. The domestic and British tobacco companies and the tobacco organizations appeal.

## ISSUES

I. Did the district court abuse its discretion in modifying the protective orders by lifting them and allowing public disclosure of the 4A indices, the documents subject to categorization, the American Tobacco sanctions documents, and the Exhibit 1 sanctions documents?

II. Did the district court's use of a categorization process, in which it did not conduct a document-by-document review of every document for which appellants claimed that privileges or the work-product doctrine applied, constitute an abuse of discretion or violate appellants' due process rights?

III. Did the order lifting the protective orders and allowing public access to the 4A indices and other documents constitute a taking of property without just compensation?

## ANALYSIS

### I.

An appellate court reviews district court discovery decisions under an abuse of discretion standard. *Montgomery Ward & Co. v. County of Hennepin,* 450 N.W.2d 299, 305–06 (Minn.1990). The district court will not be reversed unless it "abused its discretion, exercised its discretion in an arbitrary or capricious manner, or based its ruling on an erroneous view of the law." *Id.* at 306 (citations omitted).

Generally, a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." Minn. R. Civ. P. 26.02(a). The district court "has considerable discretion in granting or denying discovery requests." *Erickson v. MacArthur,* 414 N.W.2d 406, 407 (Minn.1987).

There is a presumption in favor of a common-law right of access to civil court records. *Minneapolis Star & Tribune Co. v. Schumacher,* 392 N.W.2d 197, 202 (Minn.1986); *see In re Coordinated Pretrial Proceedings,* 101 F.R.D. 34, 40 (C.D.Cal.1984) (citing principle that "adjudication is generally to be conducted in public * * * ."). The domestic appellants argue that, in contrast, the public does not have a right to have access to pretrial discovery materials. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37, 104 S.Ct. 2199, 2209–10, 81 L.Ed.2d 17 (1984) (holding protective order based on good cause does not violate First Amendment). Absent a protective order, however, nothing precludes a party from voluntarily disclosing discovery documents, sometimes known as "discovery sharing." *See* Richard J. Vangelisti, *Proposed Amendment to Federal Rule of Civil Procedure 26(c) Concerning Protective Orders: A Critical Analysis of What It Means and How It Operates,* 48 Baylor L.Rev. 163, 177 (1996) (discussing discovery sharing); *see In re "Agent Orange" Prod. Liab. Litig.,* 104 F.R.D. 559, 567 (E.D.N.Y.1985) (*Agent Orange I*) (noting that implicit in *Seattle Times* "is the conclusion that if respondent had failed to demonstrate good cause [for a protective order], the information would have been available to the public"), *aff'd,* 821 F.2d 139 (2d Cir.1987) (*Agent Orange II*).

To prevent public disclosure of matters produced in discovery, the party or person from whom discovery is sought may move for a protective order under Minn. R. Civ. P. 26.03. Under that rule, for good cause shown, the district court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense * * *." *Id.* The district court has "broad discretion to fashion protective orders and to order discovery only on specified terms and conditions." *Erickson,* 414 N.W.2d at 409 (citation omitted). For example, courts may use a protective order to permit discovery of relevant information while protecting a privilege by limiting access to the information. *Blue Cross & Blue Shield v. Larson,* 472 N.W.2d 885, 886 (Minn.App.1991) (addressing doctor-patient privilege), *review denied* (Minn. Sept. 17, 1991). This discretion allows the court to safeguard evidentiary privileges, while not allowing them to become "vehicles for the suppression of evidence which is not privileged." *Snyker v. Snyker,* 245 Minn. 405, 407, 72 N.W.2d 357, 359 (1955) (addressing earlier version of rules).

Protective orders may also promote cooperation in discovery if litigants know the information they provide will not be widely disseminated. Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L.Rev. 427, 483 (1991). Further, in complex litigation, it is not uncommon to find a blanket or umbrella order protecting documents based on the producing party's good-faith assertion that they are confidential. Robin C. Larner, Annotation, *Modification of Protective Order Entered Pursuant to Rule 26(c), Federal Rules of Civil Procedure,* 85 A.L.R. Fed. 538, 553 (1987).

The focus here is not on the original protective orders, but on the order that modified the protective orders after the consent judgment was entered, allowing public access. Rule 26.03 does not explicitly address the standard for modification of a protective order. The district court determined that release of the documents was in the public interest and that respondents had demonstrated good cause to lift the protective orders.

Minnesota appellate courts have not yet specifically articulated the standard for district courts to apply in deciding whether to modify a protective order, although this has been the subject of numerous federal appellate decisions and commentary. Larner, *supra,* §§ 3, 4. Because there are only minor differences between Fed. R.Civ.P. 26(c) and Minn. R. Civ. P. 26.03, we look to federal cases interpreting the

federal rules. *See Uselman v. Uselman,* 464 N.W.2d 130, 142 (Minn.1990) (examining federal cases interpreting federal rule for assistance in interpreting similar state rule). Although not binding on Minnesota courts, those decisions can provide "valuable guidelines in understanding [the rule's] purpose and application." *Id.*

■ Generally, the decision to modify a protective order is within the sound discretion of the district court. *Agent Orange I,* 104 F.R.D. at 568; *see* Larner, *supra,* § 3, at 557 (listing cases applying this standard). This is consistent with the rule in Minnesota affording the district courts considerable discretion in making decisions on discovery matters. *Erickson,* 414 N.W.2d at 407. But the matter of the appropriate legal standard to apply is a legal question, which we review de novo. *Montgomery Ward,* 450 N.W.2d at 306 (indicating discretionary discovery decision may be reversed if based on erroneous view of law); *see Flynn v. E.I. du Pont de Nemours & Co.,* 988 P.2d 97, 98 (Alaska 1999) (holding issues of legal standard applicable to modification of discovery orders and burden of proof are questions of law reviewable de novo).

The first question is whether respondents had the burden of proving that the protective orders should be modified or whether appellants had the burden of showing continued need for confidentiality. *See H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.,* 106 F.R.D. 551, 554 (S.D.N.Y.1985) (discussing variety of factors relevant to allocation of burden of proof); Larner, *supra,* §§ 5–9 (same). But here, because the district court placed the burden of showing good cause on respondents, and respondents do not object, we need not reach that issue.

We will next address the different standards that courts have applied in deciding whether to modify protective orders, to assist us in determining, in light of relevant Minnesota precedent, the appropriate standards to apply here. On one hand, some courts will allow modification only if

the party seeking modification has shown "extraordinary circumstances or compelling need," unless the order was improvidently granted. *Martindell v. International Tel. & Tel. Corp.,* 594 F.2d 291, 296 (2d Cir.1979) (upholding district court order denying motion by government as third-party intervenor to modify protective order, holding that a "witness should be entitled to rely upon enforceability of a protective order against any third parties," including government); *see* 1A David F. Herr & Roger S. Haydock, *Minnesota Practice* § 26.32 (3d ed.1998) (advocating this standard). Other courts use a more moderate standard than that adopted by the second circuit, balancing a variety of factors. *See, e.g., Beckman Indus., Inc. v. International Ins. Co.,* 966 F.2d 470, 475–76 (9th Cir.1992) (upholding district court decision granting intervenor's motion to modify protective order, rejecting "extraordinary circumstances test" and citing a number of factors). It has been said that "the prevailing view is more flexible [than the second circuit approach], calling for a balancing test that accords substantial importance to avoiding repetitive discovery." 8 Charles Alan Wright, & Arthur R. Miller, Richard L. Marcus, *Federal Practice & Procedure* § 2044.1, at 579–80 (1994) (noting "substantial latitude" given district courts in deciding motions to modify protective orders, based on circumstances in each case) (footnote omitted).

■ Caselaw in Minnesota emphasizes that the district courts have broad discretion to fashion protective orders based on good cause. *Erickson,* 414 N.W.2d at 409. In deciding whether to issue such orders, they are to consider all of the circumstances. *Baskerville v. Baskerville,* 246 Minn. 496, 507, 75 N.W.2d 762, 769 (1956). Consistent with this manner of deciding whether a protective order should issue in the first instance, we believe that determining whether to modify a protective order is also within the broad discretion of the district court and the decision should be made only after balancing and consider-

ing all of the relevant circumstances. Different considerations may come into play when a court addresses a postjudgment motion to modify a protective order, in contrast to a pretrial motion to issue a protective order in the first instance. *Agent Orange I*, 104 F.R.D. at 570.

■■■■ The factors that a district court should consider in deciding whether to modify a protective order will vary, depending on the circumstances in each case. *See* Larner, *supra*, at §§ 16–34 (listing factors cited in caselaw as relevant to modification motion). Among the factors courts have balanced are the nature of the protective order, the parties' reliance on it, the ability to gain access to the information in other ways, the need to avoid repetitive discovery, the nature of the material for which protection is sought, the need for continued secrecy, and the public interest involved. *Id.* Our review of similar concerns leads us to conclude that the district court did not abuse its discretion in modifying the protective orders here.

### A. Nature of Protective Orders

On June 16, 1995, the district court issued a general protective order allowing the parties to make a good-faith determination that discovery documents should be confidential if they contained a trade secret or were otherwise private or protected. The court's order warned that a party's determination did not create a presumption that such documents were confidential, provided that the order could be modified for good cause shown, and indicated that the court would issue a subsequent order addressing the use of confidential materials at trial or at the conclusion of the case as to any party. In a later order, the district court directed that the 4A indices remain confidential pursuant to the general protective order unless otherwise ordered or for good cause shown.

The protective orders were not narrowly tailored to address the specific interest for which protection was sought; they afforded broad initial protection to any document the parties in good faith deemed confidential. There may be good reasons for issuing such broad orders in complex litigation. *See Agent Orange*, 104 F.R.D. at 570 (citing factors including complexity of litigation, need for cooperation and expeditious discovery, burden on court of otherwise having to examine documents, and emotionalism of case). But such reasons may no longer suffice once a settlement is reached. *Id.; see Agent Orange II*, 821 F.2d at 148 (noting that while these factors may have warranted imposition of order at time, had district court not lifted order, appellate court would have found protective order improvidently granted as lacking showing of good cause). In this case, the complexity of the case, the hope that counsel would cooperate and expeditiously complete discovery, the huge number of documents that the court would have had to review had it not allowed the parties to designate documents as confidential, and the emotionalism of the case may have warranted a protective order. But these reasons in themselves do not justify continued protection of the documents.

### B. Reliance

■■■■ Reliance comes into play if a person or party cooperates with discovery only upon the assurance that the information will not be revealed. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F.Supp. 866, 905 (E.D.Pa.1981) (noting that complex cases "cannot be fairly and expeditiously adjudicated unless parties" can rely on guarantees of confidentiality to assure the protection of their legitimate interests). Protective orders have been called "one of the most significant management tools for guiding litigants through the pretrial process with a minimum of motion practice and needless friction." *See* Miller, *supra*, at 483. Modifying protective orders to reveal matters that parties disclosed with the expectation of limited dissemination could undermine their use in future cases. *Id.* at 494. If a

person or party cooperates with discovery of trade secrets or matters that would otherwise be protected by the Fifth Amendment, the reliance is even greater. *Beckman*, 966 F.2d at 475. Conversely, a general protective order, which is by nature over-inclusive, will induce less reliance. *Id.* at 476; *see Agent Orange II*, 821 F.2d at 147 (stating party should not expect to rely on sweeping, temporary protective order and noting order had specifically stated confidentiality issue would be reconsidered when trial began).

In this case, however, appellants do not contend they relied on the protective orders, and there is no evidence in the record that they did. First, the order was broad, applying presumptively to any matter a party in good faith deemed confidential. Next, the order specifically disavowed any presumption that the documents would be deemed confidential by the court. The order provided for future modification for good cause and indicated that the court would issue an order addressing the use of confidential materials at trial or at the conclusion of the case. Finally, it is indisputable that the protective orders did not induce cooperation in discovery. To the contrary, the record shows that appellants produced the requested discovery only after repeated court challenges, including some taken to the United States Supreme Court.

### C. Pending Litigation and Inability to Otherwise Gain Access to Information

 "Discovery sharing," in which a discovering party "seeks to share the fruits of its efforts with an outsider engaged in similar or related litigation" or where an outsider seeks access to discovery regardless of the litigants' wishes, may be considered in deciding whether to modify existing protective orders. Miller, *supra*, at 497.

It is difficult, and indeed unwise, to have an absolute prohibition on discovery sharing, given the extraordinarily high cost of litigation and the reality that discovery accounts for the largest component of that expense in many cases. Barring sharing smacks too much of requiring each litigant to reinvent the wheel, and not surprisingly it has been rejected on that basis by some courts. As Judge Wisdom has put it, "there is no reason to erect gratuitous roadblocks in the path of a litigant who finds a trail blazed by another." But always permitting sharing would be a mistake as well. Once again, leaving the decision to permit or deny sharing in the judge's discretion seems the best course to follow.

*Id.* (footnotes omitted). There are some reasons for a court to limit discovery sharing, such as when it is done for commercial gain or without valid reasons. *Id.* at 497–98. None of these reasons is present here.

### D. Particular Need for Continued Protection or Material Established To Be Privileged or Irrelevant

The next consideration is whether parties seeking a continued protective order have shown a particular need for protection or established that materials are protected by privilege or are irrelevant. Appellants do not assert that specific harm would arise from disclosure of commercial information or trade secrets. They instead assert that the documents to be released are protected by the work-product doctrine or the attorney-client privilege.

### (1) 4A Indices

 Appellants assert that because the 4A indices are protected by the work-product doctrine, the protective order limiting public disclosure should have remained in effect. As discussed above, parties may obtain discovery regarding any relevant matter that is not privileged. Minn. R. Civ. P. 26.02(a). While the term "privilege" is sometimes applied to the work-product doctrine, documents within the ambit of this doctrine are not actually "privileged," but instead are generally "im-

mune" from discovery. *Brown v. St. Paul City Ry. Co.*, 241 Minn. 15, 35, 62 N.W.2d 688, 701 (1954).

 Nonetheless, a party may obtain discovery of documents prepared in anticipation of litigation or for purposes of trial based on a showing of

> substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Minn. R. Civ. P. 26.02(c). Even if a party makes the required showing, courts must protect against the disclosure of "mental impressions, conclusions, opinions, or legal theories of an attorney" regarding the litigation. *Id.; Dennie v. Metropolitan Med. Ctr.*, 387 N.W.2d 401, 406 (Minn.1986).

The domestic appellants contend that the district court applied an incorrect standard when determining that the protective orders should be lifted to permit public disclosure of the 4A indices. In its November 25, 1998, order, the district court determined that release of the indices was in the public interest and that respondents had demonstrated good cause for lifting the protective orders from the indices. The court ordered that the "4A indices, as produced to the Minnesota plaintiffs (i.e. with the same fields of information and with the same redactions) shall be released to the public." Appellants argue that because the 4A indices are attorney work product, the standard articulated in rule 26.02(c) for obtaining discovery of the documents—substantial need and undue hardship—should be applied in determining whether to permit disclosure to the public. They contend that "work-product materials retain[ ] their immunity from discovery after the termination of the litigation for which the documents were prepared * * *." *Federal Trade Commn. v. Grolier Inc.*, 462 U.S. 19, 26, 28, 103 S.Ct. 2209, 2214–15, 76 L.Ed.2d 387 (1983) (holding, under Freedom of Information Act, "attorney work product is exempt from mandatory disclosure without regard to status of litigation for which it was prepared").

 Appellants' arguments are unpersuasive for several reasons. First, the parts of the 4A indices that the district court ordered domestic appellants to produce, and ultimately disclose, are the objective portions of the indices; the court protected all subjective portions that might contain attorneys' mental impressions or strategy. That limitation is completely consistent with the admonition in rule 26.02(c) to guard against disclosure of counsel's opinions and strategy. Material prepared in anticipation of litigation that does not contain such mental impressions or strategy does not constitute work product. *Dennie*, 387 N.W.2d at 406. Secondly, the question here is whether the protective orders should be modified, not whether to permit discovery. Appellants cite no authority supporting their contention that the standards for determining when to permit discovery of attorney work product should apply to a posttrial determination of whether to modify protective orders that limited the dissemination of materials produced during discovery.

### (2) Categorization Documents

As discussed above, the domestic appellants produced some 37,000 documents to respondents pursuant to the district court's March 7, 1998, order and the British appellants produced some 2,000 documents.

 A threshold question is whether this appeal is moot as to the documents Congress placed on the Internet (all but 39 of domestic appellants' 37,000 documents). An appellate court will "hear only live controversies and will not pass on the merits of a particular question merely for the purpose of setting precedent" *In re Inspection of Minn. Auto. Specialties, Inc.*, 346 N.W.2d 657, 658 (Minn. 1984). If an appellate court "is unable to grant effectual relief," the issue will be deemed moot. *In re Schmidt*, 443 N.W.2d 824, 826 (Minn.

1989). An exception exists if the issue is "capable of repetition yet evading review." *Id.*

The domestic appellants, while acknowledging that many of their documents are publicly available, contend the resolution of the appeal will have a great impact on the future of the attorney-client privilege and the work-product doctrine in Minnesota. But because the documents released on the Internet are already in the public domain, this court cannot grant effectual relief as to those documents, and the issue of public disclosure is moot as to these documents.[6] We must, however, resolve challenges as to the 39 documents of the domestic appellants that have not been placed on the Internet, as well as challenges relating to the some 2,000 British appellants' documents.

These categorization documents were deemed confidential by appellants under the general protective order of June 16, 1995. Appellants challenge the November 25, 1998, district court order that the protective order be lifted as to all but two of these documents and that they be released to the public. In that order, the court noted that appellants had sought appellate relief prior to producing the documents, that many of the documents were subpoenaed and posted on the Internet by Congress, and that all of the documents were "de-privileged as part of the categorization process." Appellants continue to assert that these documents are protected by the attorney-client privilege or the work-product doctrine, and contend that not all documents were "de-privileged" because judicial officers did not review each document.

▌ Our consideration of the arguments involving the work-product doctrine is explained above, and we address the crime-fraud exception here. To invoke the crime-fraud exception to the attorney-client privilege, the proponent must make a prima facie showing that a communication was "(1) made in furtherance of a crime or fraud and (2) was closely related to the fraud." *Levin v. C.O.M.B. Co.*, 469 N.W.2d 512, 515 (Minn.App.1991) (footnote and citation omitted), *review denied* (Minn. July 24, 1991). The critical inquiry is whether the attorney-client privilege has become unworthy of protection. *Id.*

The district court adopted the special master's findings, determining by a preponderance of the evidence that appellants had engaged in criminal and fraudulent conduct by failing to conduct research into the safety of tobacco products and failing to warn consumers about research that did support negative conclusions and that appellants' attorneys acted in furtherance of this conduct. The court concluded that documents relating to appellant's research were within the scope of the crime-fraud exception and subject to discovery, despite appellants' assertions of privilege.

▌ One purpose of a protective order is to safeguard evidentiary privileges. *Snyker*, 245 Minn. at 407–08, 72 N.W.2d at 359. As to the documents the district court determined were not privileged, appellants can offer no justification for a protective order. Likewise, as discussed above, "work-product" documents that contain only objective information do not warrant protection. Finally, as to materials produced pursuant to the crime-fraud exception, these materials have been determined to be unprotected by attorney-client privilege.

*(3) American Tobacco Sanctions Documents*

Domestic appellants contend that most of the 1,114 American Tobacco documents that the district court ordered produced as a sanction were privileged under the cate-

---

**6.** Like the documents on the Internet, the 61 documents entered as exhibits at trial are also part of the public record. *See Minneapolis Star & Tribune*, 392 N.W.2d at 202 (noting that "common law right to inspect and copy civil court records exists"). Therefore, whether the district court erred in modifying the protective orders to permit public disclosure of those documents is also moot.

gorization process and should not be disclosed. Because these documents were placed on the Internet by Congress, the public disclosure issue is moot. *See Schmidt*, 443 N.W.2d at 826 (stating if appellate court cannot grant effectual relief, issue will be deemed moot).

### *(4) Exhibit 1 Documents*

 Appellants contend that the protective orders should not have been lifted as to the Exhibit 1 documents because they asserted privileges for these documents. The district court struck the privileges as a sanction for discovery abuse. *See* Minn. R. Civ. P. 37.02(b) (providing for sanctions for failure to obey discovery order). Because the claims of privilege were stricken, there is no basis for limiting public disclosure. Appellants' claims that public disclosure is an additional sanction has no merit.

### *E. Public Interest*

The public interest and public health and safety concerns are factors that weigh in favor of allowing public disclosure. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir.1994) (citing public health and safety); *Agent Orange II*, 821 F.2d at 148 (citing enormous public interest).

The district court cited the public interest favoring release of the indices and documents. We agree for the reasons set out by amicus United States. There is compelling public interest in the indices, which will assist the government and others researching the content of the millions of documents produced in this case. Facilitating access to this information will aid federal agencies and others researching and analyzing tobacco-related health matters. Likewise, there is compelling public interest in the disclosure of the documents that address the addictive nature of nicotine, research by the tobacco industry into nicotine addiction, and advertising tobacco products to minors.

It is apparent that the district court considered many factors and all the circumstances in determining that it was appropriate to modify the protective orders and authorize public disclosure. We cannot conclude that modification was an abuse of discretion. In light of our conclusion, it is unnecessary to analyze the court's decision that in the alternative modification of the protective orders was required by the terms of the parties' settlement and by the consent judgment.

### II.

Appellants argue that even if the district court used the correct standard, it made legal errors requiring reversal or remand. They contend that because most of the documents for which they claimed privilege were not reviewed individually by a judicial officer, public release would vitiate the confidentiality of those documents. They continue to assert that individualized review of the documents is required. Respondents contend that for a variety of reasons, these issues are not properly before the court. We have some doubts as to whether the issues were preserved, but because it appears that at least the British appellants may have properly raised the issues, we address them.

 In deciding whether existing discovery rules and caselaw required the district court to examine each document in camera to assess privilege claims, we begin again with the proposition that the district court has considerable discretion in controlling the discovery process, in fashioning protective orders, and in specifying the terms and conditions under which discovery will occur. *Erickson*, 414 N.W.2d at 407, 409. Appellants claim that as a matter of law under *Erickson*, the district court was required to view each document in camera. *See id.* at 409 (holding district court erred in ordering discovery with protective order without examining documents in camera). In *Erickson*, however, the district court was not faced with the massive number of documents present here. Nor did the court in *Erickson* find, as the

district court did here, that appellants made claims of privilege for "documents which are clearly and inarguably not entitled to protections of privilege," or that unwarranted claims of privilege merited a sanction of "release of all documents for which privilege is improperly claimed." Under these circumstances, *Erickson* is not controlling and we find no abuse of discretion or error of law.

■ Appellants also argue that procedural due process concerns are implicated. They contend that by failing to evaluate their privilege claims on a document-by-document basis, the district court deprived them of due process of law.

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

*Heddan v. Dirkswager*, 336 N.W.2d 54, 58 (Minn.1983). The first question, therefore, is whether assertions of the attorney-client privilege and the work-product doctrine constitute liberty or property interests protected by procedural due process. For purposes of this discussion, we assume, without deciding, that this challenge comes under "the procedural due process rubric." *Grussing v. Kvam Implement Co.*, 478 N.W.2d 200, 203 (Minn.App.1991) (noting "challenges of statutory privileges have also been analyzed under the procedural due process rubric"); *see United States v. Zolin*, 491 U.S. 554, 571, 109 S.Ct. 2619, 2630, 105 L.Ed.2d 469 (1989) (noting possible due process implications in the routine use of in camera proceedings to decide applicability of crime-fraud exception to attorney-client privilege).

■ We analyze appellants' due process claim by using the traditional balancing test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

As to the first factor, appellants contend they have a deeply rooted and incalculably valuable interest in the privacy of confidential communications with their counsel. *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 89 (3d Cir.1992). We note that almost all of the domestic tobacco companies' documents are now on the Internet and thus are no longer confidential. Further, as the district court noted, documents are entitled to protection under attorney-client privilege and work-product doctrine only when the protection is properly claimed and is neither waived nor lost. Appellants improperly claimed the privilege and have lost it.

The second factor evaluates the risk that a party will suffer an erroneous deprivation. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. Appellants contend that in weighing this factor, the district court "recognized that otherwise-privileged documents may lose their privileged status if and when review of less than the entire category reveals abuse of the privilege." Appellants, however, failed to consider the balance of the district court's discussion. The district court went on to explain that

> otherwise privileged documents may lose their privileged status if and when review of less than the entire category reveals abuse of the privilege. However, the law provides that sanctions may be imposed for abuse of process and disregard of court rules and orders. The resulting sanction—loss of privilege for a category of documents—is in line with those sanctions authorized by statute and case law in this jurisdiction.

Thus, the court indicated that the loss of privilege was a result of appellants' failure to categorize the documents properly.

The district court employed a considerable number of safeguards for appellants' rights. Appellants had extensive opportunities to participate in the process. Although they declined to participate in the establishment of categories, they made all decisions as to which documents to place into the categories and had the opportunity to review their placement to evaluate the appropriateness of their claim of privilege. Appellants were also given virtually unlimited opportunities for ex parte argument and in camera review by the special master; they were allowed to provide their redacted versions of selected documents to opposing counsel; they were informed of the specific documents randomly selected for review by the special master; and they had ample opportunity to rebut the special master's report in additional briefings and oral arguments to the district court. We applaud the district court's efforts to provide safeguards and opportunities for appellants to establish their privilege claims.

The final factor is the fiscal and administrative burdens that the proposed additional or substitute procedural requirement—the document-by-document review of the exhibits—would entail. *Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. Appellants contend that while the government's interests may be taken into account, it was respondents' request for "virtually boundless discovery" and insistence on challenging each claim of privilege, compounded by the district court's refusal to consider postponement of the trial date, that created the administrative burdens here.

The district court properly noted the governmental and judicial interest in providing a proper forum for timely determination of the underlying claims. As the district court noted, an individualized review of each of appellants' documents would have required "massive quantities of resources, the services and related expenses of numerous 'attorney-special master assistants' dedicated to reviewing documents and properly committed to confidentiality, and massive quantities of time, in effect years." Balancing these private interests, the risk of erroneous deprivation, the questionable value of the alternative championed by appellants, and the governmental and judicial interests, we agree with the district court's determination that appellants' due process rights were not violated.

### III.

The domestic tobacco companies allege that the district court's release, without payment, of the 4A indices and other documents not on the Internet violates the provisions in the United States and Minnesota Constitutions prohibiting the taking or damaging of property without just compensation. *See* U.S. Const. amend. V (stating private property will not be taken for public use "without just compensation"); Minn. Const. art. I, § 13 (stating private property will not be taken "or damaged" without just compensation). On appeal, the British tobacco companies have adopted the domestic tobacco companies' takings arguments. The district court did not explicitly address the takings issue.

The Supreme Court has addressed a similar takings allegation. There, a corporation sought injunctive relief, alleging a taking without just compensation would occur because an administrative agency was statutorily allowed to use and disclose certain corporate trade secrets. In addressing the alleged taking, the Supreme Court examined whether: (1) the corporation had a property interest in the trade secrets; (2) any interests would be taken; (3) any taking would be for a public purpose; and (4) adequate compensation would be paid. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–01, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984). Here, the 4A indices and other documents are being released to the public without payment to the tobacco companies. Also, as noted above, the public interest supports release

of the materials at issue. Therefore, the unresolved questions regarding the takings claim are whether the tobacco companies had a protectable property interest in the indices and documents not on the Internet and whether any interest in those materials was "taken" or "damaged."

### A. Confidential Information

Appellants allege that Minnesota law gives them a protectable property interest in the materials at issue here. *See Ruckelshaus,* 467 U.S. at 986, 104 S.Ct. at 2872 (stating creation of property interests occurs by source of law independent of Constitution, like state law). Appellants allege that the 4A indices are no different from the confidential business data at issue in *Ruckelshaus* and that all the materials at issue are their confidential business information. *See Carpenter v. United States,* 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (stating "[c]onfidential business information has long been recognized as property").

■ Minnesota has not expressly defined the term "confidential business information." In the context of "trade secrets," however, the supreme court stated:

> [K]nowledge gained at an employer's expense, which takes on the characteristics of a trade secret and which would be unfair for the employee to use elsewhere, is deemed confidential and is not to be disclosed or used.

*Jostens, Inc. v. National Computer Sys., Inc.,* 318 N.W.2d 691, 702 (Minn.1982) (citing *Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81 (Minn.1979)). To be a "trade secret," information must have "independent economic value" as a result of its not being generally known or readily ascertainable by persons who can make use of the information. Minn.Stat. § 325C.01, subd. 5(i) (1998); *see Rehabilitation Specialists, Inc. v. Koering,* 404 N.W.2d 301, 306 (Minn.App.1987) (citing Minn.Stat. § 325C.01, subd. 5 (1986), and *Jostens* when addressing alleged misappropriation of confidential business infor-

mation). Implicit in the description of "confidential information" and the definition of "trade secret" is the idea that the business came by the materials in question in the normal course of its business. *See Carpenter,* 484 U.S. at 26, 108 S.Ct. at 320 (stating "confidential information" is "information acquired or compiled by a corporation in the course and conduct of its business" (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed.1986) (footnote omitted))). Here, because the attorneys for the tobacco companies compiled the 4A indices for litigation purposes, the indices were not compiled by the businesses themselves. Nor were they compiled in or for the course or conduct of appellants' business. Therefore, the 4A indices are not entitled to protection as "confidential business information."

■ Nor are the other documents not already on the Internet "confidential business information." The Exhibit 1 documents are documents addressing addiction and nicotine that, but for their systematic miscategorization by appellants, would have been among the Category 3 documents the district court ordered produced under the categorization process. The district court found that the documents ordered produced under the categorization process were not privileged or were tainted by crime-fraud. Therefore, to rule that the Exhibit 1 documents or the other privileged, categorized documents not already on the Internet were compiled in the course of appellants' business would be to rule that crime and/or fraud are part of the tobacco business. We decline to make such a ruling. Moreover, appellants have not shown that any of the documents not already on the Internet have an "independent economic value." Therefore, we conclude that the Exhibit 1 documents and the categorized documents not already on the Internet are not entitled to protection as "confidential business information."

### B. Attorney–Client Privilege and Work Product

Appellants allege that they have a property interest in the documents at issue here because they are protected by the attorney-client privilege. Citing opinions of the Minnesota Lawyers Professional Responsibility Board, appellants also argue that attorney work product is the property of the attorney's client and therefore, appellants have a property interest in the materials at issue here. *See* Minn. Law. Prof. Resp. Bd. Ops. 11 (stating "[i]t is professional misconduct" for counsel to put a lien "on the files and paper of a client"), 13 (defining "client files, paper, and property").

In Minnesota, the impact of pronouncements regarding attorney conduct is limited to the context of attorney conduct. *See State v. Serstock*, 402 N.W.2d 514, 516 (Minn.1987) (stating "[t]he Code of Professional Responsibility was intended *solely* to provide guidance for professional discipline") (emphasis added); *cf.* Minn. R. Law. Prof. Resp. 4(c) (stating Lawyers Board has "general supervisory authority" over the Rules on Lawyers Professional Responsibility and may, "from time to time," issue opinions on "professional conduct"). Also, even assuming the Lawyers Board opinions apply beyond the context of attorney conduct, we have doubts whether the materials at issue fit the rules' definitions. Therefore, we have grave doubts whether appellants can successfully use the Lawyers' Board opinions to show that because the materials at issue are attorney work product, the materials are constitutionally protected for takings purposes.

On this record, however, we need not resolve those doubts. As noted above, the portions of the 4A indices allowed to be released are not work product because they are the objective portions of the indices and do not reveal counsel's mental impressions, trial strategy, and legal theories. *See Dennie*, 387 N.W.2d at 406 (stating materials that do not reveal counsel's mental impressions, trial strategy, or legal theories are not work product). Nor are the objective portions of the indices protected by the attorney-client privilege. *See Kobluk v. University of Minnesota*, 574 N.W.2d 436, 440 (Minn.1998) (noting application of attorney-client privilege requires request for legal advice and that privilege does not apply where attorney acts as mere scrivener). Thus, neither the work-product doctrine nor the attorney-client privilege can justify a ruling that appellants have a protectable property interest in the objective portions of the 4A indices.

Also as noted above, but for appellants' systematic miscategorization of the Exhibit 1 documents, they would have been produced with the Category 3 documents on addiction and nicotine. Because the Category 3 documents and the other categorized documents either are not privileged or are tainted by crime-fraud, neither the work-product doctrine nor the attorney-client privilege protects those documents. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 659–60 (10th Cir. 1998) (stating attorney-client privilege does not apply where client consults counsel to further crime or fraud and noting crime-fraud exception "applies to both the attorney-client privilege and the work-product doctrine"); *cf. In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.1995) (stating crime-fraud exception applies where communication with counsel or attorney work product was intended to assist or conceal criminal activity). Thus, the Exhibit 1 documents and the other categorized documents not already on the Internet are not protected by the doctrine of attorney work product or by the attorney-client privilege. Therefore, those documents are like the 4A indices because they are documents in which appellants lack a protectable property interest.

Because we reject appellants' arguments that they have a protectable property interest in the materials at issue,

release of the materials at issue does not involve a compensable taking or damage of those materials, and we need not address the parties' other arguments regarding the takings issue. *See Central Baptist Theological Seminary v. City of New Brighton,* 487 N.W.2d 528, 533 (Minn.App.1992) (stating "[w]here there is no right, there can be no taking"), *review denied* (Minn. Aug. 27, 1992).

## DECISION

The decision of the district court to lift the protective orders and allow public access to the discovery documents is affirmed.

**Affirmed.**