ADAMS, Intervenor–Appellant,

v.

METALLICA, INC. et al., Appellees.

[Cite as *Adams v. Metallica, Inc.* (2001), 143 Ohio App.3d 482.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000513.

Decided June 1, 2001.

484

*Frost, Brown, Todd, L.L.P.*, and *Scott D. Phillips*, for intervenor-appellant.

*Freund, Freeze & Arnold LPA* and *Mark A. MacDonald*, for defendants-appellees, Metallica, Inc., Metallica, and its band members, individually.

---

GORMAN, Presiding Judge.

Randy R. Adams brings this appeal from the trial court's order denying his motion to intervene in a case that had previously been settled and voluntarily dismissed under Civ.R. 41(A). The motion to intervene was part of Adams's effort to modify a protective order that had sealed video recordings and transcripts of depositions filed in the dismissed case. In his sole assignment of error, Adams challenges the trial court's decision denying him the right to intervene, as well as the court's original decision to grant a protective order sealing the materials. For the reasons that follow, we affirm.

## I

The main action involved a plaintiff named Keith Phillips and the heavy-metal band Metallica. Phillips had sustained serious injuries while at a Metallica concert at the Riverbend Music Center in Hamilton County, Ohio. According to witnesses, Phillips, whose nickname was "Crazy Indian," had repeatedly volunteered to be "launched" into the air above the heads of fans that had congregated for that purpose in the lawn area. The group of approximately thirty fans was expected to catch the person launched once that person assumed a horizontal position above their heads.

According to friends, Phillips, who was already intoxicated, started to act more erratically after drinking from a mysterious "blue bottle" being passed around the crowd. After several successful launches, Phillips decided to attempt another launch, this time imitating another participant he had seen perform a mid-air somersault. Once airborne, Phillips tucked his body and went into an uncontrolled spin above the group. Unfortunately, Phillips did not come out of the spin in time. Instead of catching him, the other participants, fearing for their safety, parted and allowed Phillips, still spinning, to fall headfirst on the ground. The damage to Phillips's spine rendered him a paraplegic.

Adams sustained his injury from what he argues was the same sort of "moshing" activities at a concert venue in Indiana. Although Metallica was the concert's headliner, Adams's injury occurred during the performance of Suicidal

Tendencies, an opening act. Unlike Phillips, Adams did not engage in "launching." Rather, he alleged that his injury had occurred as a result of "chest trauma" inflicted by fans slamming against his body in an overly aggressive "mosh pit" that he had voluntarily joined. After being seen by friends "moshing," Adams later collapsed and was taken to a hospital, where he arrived comatose. A physician who performed a neurological consultation at the hospital stated that a "crush injury of the chest" was probable. The primary diagnostic impression was "[h]ypoxic encephalotopthy, severe," with seizures. But a cardiologist who later examined Adams on behalf of Metallica attributed Adams's cardiac arrest to a congenital heart condition called "QT Long Syndrome," which can be triggered by loud music.

## II

Although the order appealed from in this case resulted from a motion to intervene, Adams's argument on appeal focuses almost exclusively on the validity of the protective order in the underlying action. The gist of Adams's argument is that the protective order reflected an agreement among the parties, but was never fully considered by the trial court, thus rendering it void. Such a strategy, however, cannot obscure the fact that the order appealed from is that of a nonparty seeking to intervene in the case for the purpose of challenging the order. The focus here, therefore, is not on the original decision sealing the materials but on the subsequent decision not to allow Adams the right to pursue their unsealing.

### 1. Pretrial Discovery, Protective Orders, and The Public Right of Access

Civ.R. 26(B) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Subsection (C), however, expressly permits the trial court "for good cause shown" to "make any order that justice requires to protect a party * * * from annoyance, embarrassment, oppression, or undue burden or expense." The Ohio Supreme Court has held that protective orders under this subsection are an exercise of the trial court's discretion. *Ruwe v. Springfield Twp. Bd. of Trustees* (1987), 29 Ohio St.3d 59, 61, 29 OBR 441, 443, 505 N.E.2d 957, 959; *State ex rel. Gross v. Marshall* (1974), 39 Ohio St.2d 92, 94, 68 O.O.2d 54, 55–56, 314 N.E.2d 170, 172.

One of the protective measures expressly provided for in the rule is that a deposition be sealed and "opened only by order of the court." *Id.* Obviously a deposition under seal, and yet filed with the court, is no longer open to public scrutiny. Conversely, the "open courts" provision of Section 16, Article I of the Ohio Constitution provides that "[a]ll courts shall be open * * *." This language

has been interpreted, however, to create only "a qualified right of public access to proceedings which have historically been open to the public and which public access plays a significantly positive role." *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas, Juv. Div.* (1995), 73 Ohio St.3d 19, 20, 652 N.E.2d 179, 181.

Discovery has historically never been open to the public. Indeed, noting that discovery proceedings were not open to the public at common law, the United States Supreme Court has held that "pretrial depositions are not public components of a civil trial." *Seattle Times Co. v. Rhinehart* (1984), 467 U.S. 20, 33, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17, 27. As the court explained in a footnote:

■ "Discovery rarely takes place in public. Depositions are scheduled at times and places most convenient to those involved. Interrogatories are answered in private. Rules of Civil Procedure may require parties to file with the clerk of the court interrogatory answers, responses to requests for admissions, and deposition transcripts. See Fed.Rule Civ.Proc. 5(d). Jurisdictions that require filing of discovery materials customarily provide that trial courts may order that the materials not be filed or that they be filed under seal. See *ibid.*; Wash.Super.Ct.Civ. Rule 26(c). Federal district courts may adopt local rules providing that the fruits of discovery are not to be filed except on order of the court. See, *e.g.,* C.D.Cal.Rule 8.3; S.D.N.Y.Civ.Rule 19. Thus, to the extent that courthouse records could serve as a source of public information, access to that source customarily is subject to the control of the trial court." *Id.* at fn. 19.

In addition to the "open courts" provision of the Ohio Constitution, Ohio has its own Public Records Act, R.C. 149.43. Under the Act, all public records are required to be made available for public inspection. With certain exceptions, a public record is "any record that is kept by any public office * * *." The purpose of the Act "is to expose government activity to public scrutiny * * *." *White v. Clinton Cty. Bd. of Commrs.* (1996), 76 Ohio St.3d 416, 420, 667 N.E.2d 1223, 1226–1227.

In *State ex rel. Mothers Against Drunk Drivers v. Gosser* (1985), 20 Ohio St.3d 30, 20 OBR 279, 485 N.E.2d 706, the Ohio Supreme Court discussed whether court documents were public records. The court held the following in the first paragraph of its syllabus:

"Any document appertaining to, or recording of, the proceedings of a court, or any record necessary to the execution of the responsibilities of a governmental unit is a 'public record' and 'required to be kept' within the meaning of R.C. 149.43. Absent any specific statutory exclusion, such record must be made available for public inspection."

Among the statutory exceptions to R.C. 149.43, there is none that specifically excludes discovery materials. But, in *State ex rel. WHIO–TV–7 v. Lowe* (1997), 77 Ohio St.3d 350, 673 N.E.2d 1360, the Ohio Supreme Court, citing *Seattle Times*, held that discovery exchanged by the prosecutor with the defendant under Crim.R. 16 was not subject to release as a "public record." In so holding, the court did not make any reference to its earlier decision in *MADD*, but chose, rather, to quote the United States Court of Appeals for the Eleventh Circuit in *United States v. Anderson* (C.A.11, 1986), 799 F.2d 1438. A portion of that quote appears below:

"Discovery is neither a public process nor typically a matter of public record. Historically, discovery materials were not available to the public or press. See *Seattle Times Co. v. Rhinehart* * * *. Moreover, documents collected during discovery are not 'judicial records.' Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation. That is why parties regularly agree, and courts often order, that discovery information will remain private. Marcus, *Myth and Reality in Protective Order Litigation*, 69 Cornell L.Rev. 1, 15 (1983).

"If it were otherwise and discovery information and discovery orders were readily available to the public and the press, the consequences to the smooth functioning of the discovery process would be severe. Not only would voluntary discovery be chilled, but whatever discovery and court encouragement that would take place would be oral, which is undesirable to the extent that it creates misunderstanding and surprise for the litigants and the trial judge. Litigants should not be discouraged from putting their discovery agreements in writing, and district judges should not be discouraged from facilitating voluntary discovery." *Id.* at 1441, quoted in *Lowe* at 354, 673 N.E.2d at 1363.

Determining that criminal discovery would be "frustrated" if subjected to the required disclosure under R.C. 149.43, the court in *Lowe* unanimously held that exchanged materials were not "public records." It is noteworthy that the court did not base its holding on any of the statutory exclusions of the Public Records Act, thus appearing to contradict its own syllabus law in *MADD*. In fact, the court indicated that information already exchanged in discovery "ordinarily would not be considered to be work product or trial preparation materials," an apparent reference to the statutory exclusion for "trial preparation" found in R.C. 149.43(1)(g) and (4).[1] *Id.* at 353, 673 N.E.2d at 1363. The court also rejected the

---

1. The fact that the court in *Lowe* did not consider discovery trial preparation is somewhat odd considering that it quoted the court in *Anderson* that "the sole purpose of discovery is to assist trial preparation."

argument that the public has a First Amendment right to pretrial discovery materials, relying again upon the United States Supreme Court's holding in *Seattle Times* that pretrial discovery is not a public component of a trial. *Lowe* at 355, 673 N.E.2d at 1364.

It is difficult to reconcile the holding of *Lowe* with the first paragraph of the syllabus of *MADD*. *Lowe*, being the latter case, must be viewed as creating an exception to *MADD* for pretrial discovery. While *Lowe* concerned only discovery in a criminal case, the logic of *Lowe* would appear to apply with equal, if not more, force to civil discovery in a private lawsuit. Discovery exchanged by a prosecutor in a criminal case is clearly a governmental activity to which the Act would otherwise appear to apply, whereas discovery in a private lawsuit does not involve any government activity other than judicial supervision.

One arguably distinguishing factor between criminal discovery and civil discovery is the fact that civil discovery is often filed with the trial court and thus made part of the record. Pursuant to Civ.R. 5(D), discovery materials such as depositions, when they are to be used as evidence or considered on a motion, are required to be filed with the trial court. Although pretrial discovery was not open to the public at common law, both the United States Supreme Court and the Ohio Supreme Court have recognized a "historically based, common law right to inspect and copy judicial records and documents." *State ex rel. Scripps Howard Broadcasting Co., supra*, 73 Ohio St.3d at 22, 652 N.E.2d at 183, citing *Nixon v. Warner Communications, Inc.* (1978), 435 U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570, 579.

The question arises, therefore, whether the act of filing a deposition with the court has the effect of making it accessible to the public as a "public record" under the Public Records Act (*i.e.*, limiting *Lowe* to criminal discovery), and if so, whether a protective order of the court "trumps" the Act. Frankly, we do not know how the Ohio Supreme Court would answer this question. Obviously, in *Lowe*, the court assumed that it had the authority to create its own exceptions to the Public Records Act—exceptions in addition to those created by statute. The court's language in *Lowe*, particularly the lengthy quote from *Anderson* referring to both civil and criminal discovery as private processes, would strongly indicate that the court felt that both forms of discovery were not public records.

 It must be noted, further, that the common-law right of inspection of judicial records and documents is not absolute. *Nixon, supra*, at 598–599, 98 S.Ct. at 1312–1313, 55 L.Ed.2d at 580. Discussing the scope of the rule, the court in *Nixon* observed:

"Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper

purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not 'used to gratify private spite or promote public scandal' through the publication of 'the painful and sometimes disgusting details of a divorce case.' [Citations omitted.] Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption [citations omitted], or as sources of business information that might harm a litigant's competitive standing. [Citations omitted.]

"It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. *The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.*" *Id.* (Emphasis supplied.)

As we have pointed out, historically civil discovery has not been considered a matter open to the public. While it is true that the Civil Rules require that discovery depositions to be used in support of a motion be filed with the trial court, Civ.R. 26(C) grants to the trial court the discretionary power to seal the transcripts when "good cause" is shown. It strikes us as odd that the court would be given this discretionary power if the same material was subject to mandatory disclosure as a public record. At least one other state, Pennsylvania, has seen fit to expressly exclude information restricted by order of a court from its Right to Know Act. See Pa.Stat.Ann. 66.1(2).

▮ In sum, there appears to be no clear, unqualified public right to inspect pretrial discovery materials, even when they are filed with the trial court, under either the First Amendment, the common law, the "open courts" provision of the Ohio Constitution, or the Ohio Public Records Act. As a caveat, however, we note that the court's control over access to discovery documents is not unfettered. Simply because there is no clear public right to these materials does not mean that trial courts should feel free to seal them from inspection. As noted by one court, "It is precisely because courts have the power to trump freedom of information laws that they should exercise this power judiciously and sparingly." *Pansy v. Borough of Stroudsburg* (C.A.3, 1994), 23 F.3d 772, 791, fn. 29. The Civil Rules clearly contemplate that discovery documents on file with the court shall not be sealed from the public absent "good cause shown," thus creating a presumption in favor of public access to such materials. With this in mind, we agree with the court in *Pansy* that requests for protective and confidentiality orders should be viewed by trial courts with abundant skepticism and granted

only begrudgingly. See FitzGerald, Note, Sealed v. Sealed: A Public Court System Going Secretly Private (1990), 6 J.L. & Pol. 381, 382.

## 2. Intervention

Adams did not move to intervene as a matter of right under Civ.R. 24(A). Rather, Adams moved to be allowed to intervene under Civ.R. 24(B)'s permissive-joinder provision:

"Upon timely application anyone may be permitted to intervene in an action * * * when an applicant's claim or defense and the main action have a question of law or fact in common."

Upon first impression, it would appear that intervention is not the appropriate means to challenge a protective order in a previously settled case, since there is no longer an action to join. But there is among federal courts a "forming consensus" that permissive intervention is the appropriate procedural device to use when a litigant who is not an original party to an action seeks to challenge protective orders entered in that action. *Pansy, supra,* at 778 (collecting cases).

Significantly, when intervention is used to challenge a protective order, courts have expressly held that the legal or factual nexus required by the rule is relaxed. See, *e.g., Beckman Indus., Inc. v. Internatl. Ins. Co.* (C.A.9, 1992), 966 F.2d 470, 473–474. Indeed, in *Pansy* the court held that the nexus is satisfied merely by virtue of the fact that the party seeking intervention is making a challenge to the validity of the protective order in the main action. *Pansy* at 778. Further, the fact that the underlying action has been long settled does not preclude a party from seeking intervention to challenge a protective order. See, *e.g., id.* at 779; *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.* (C.A.3, 1993), 998 F.2d 157; *Beckman, supra,* at 471, 473–475; *Brown v. Advantage Engineering, Inc.* (C.A.11, 1992), 960 F.2d 1013, 1014–1016; *United Nuclear Corp. v. Cranford Ins. Co.* (C.A.10, 1990), 905 F.2d 1424, 1426–1429. The delay in intervening is deemed not to be crucial, since the purpose of entering the action is not to reopen the case on its merits, but merely to litigate the limits or propriety of the protective order. *Pansy, supra,* at 780.

Traditionally, a ruling on a motion to intervene pursuant to Civ.R. 24(B) has been held to rest within the discretion of the trial court. See *Williams v. Avon* (1977), 52 Ohio App.2d 210, 6 O.O.3d 204, 369 N.E.2d 486. Further, intervention after final judgment was considered extraordinary and generally not granted unless it was the only way to protect the intervenor's rights. *Kourounis v. Raleigh* (1993), 89 Ohio App.3d 315, 624 N.E.2d 276; *Likover v. Cleveland* (1978),

60 Ohio App.2d 154, 14 O.O.3d 125, 396 N.E.2d 491; *Eveland v. Eveland* (Apr. 24, 1996), Hamilton App. No. C–950717, unreported, 1996 WL 194247.

These standards, however, arose out of cases in which the parties seeking to intervene were attempting to litigate the merits of the underlying suit. Where intervention is instead used as a means of challenging a protective order in the main action, the old rules and analyses have been deemed "not helpful." *Pansy, supra*, at 780, fn. 7. Although the matter is still deemed to rest within the trial court's discretion, appellate courts have articulated a variety of standards that the trial court should employ in exercising that discretion. As one court summarized the various standards:

"On the one hand, some courts will allow modification only if the party seeking modification has shown 'extraordinary circumstances or compelling need,' unless the order was improvidently granted. *Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir.1979) (upholding district court order denying motion by government as third-party intervenor to modify protective order, holding that a 'witness should be entitled to rely upon enforceability of a protective order against any third parties,' including government); * * *. Other courts use a more moderate standard than that adopted by the second circuit, balancing a variety of factors. See, *e.g., Beckman Indus., Inc. v. International Ins. Co.*, 966 F.2d 470, 475–76 (9th Cir.1992) (upholding district court decision granting intervenor's motion to modify protective order, rejecting 'extraordinary circumstances test' and citing a number of factors). It has been said that 'the prevailing view is more flexible [than the second circuit approach], calling for a balancing test that accords substantial importance to avoiding repetitive discovery.' 8 Charles Alan Wright & Arthur R. Miller, Richard L. Marcus, Federal Practice & Procedure 2044.1, at 579–80 (1994) (noting 'substantial latitude' given district courts in deciding motions to modify protective orders, based on circumstances in each case) * * *." *State v. Philip Morris, Inc.* (Minn.App.2000), 606 N.W.2d 676, 687.

We hesitate to require a showing of "extraordinary circumstances" or "compelling need" in order to modify a protective order. Rather, when discretion is exercised on such matters, we hold that the trial court should employ a balancing test. The avoidance of repetitive discovery is but one of several important factors to be considered. As noted by the court in *Philip Morris*, a nonexhaustive list of these factors would include "the nature of the protective order, the parties' reliance on it, the ability to gain access to the information in other ways, the need to avoid repetitive discovery, the nature of the material for which protection is sought, the need for continued secrecy, and the public interest involved." *Id.* at 688. Also important to consider would be the degree of similarity between the two suits used to justify the claim of repetitious or

overlapping discovery, as well as the merits of the second suit when weighed against the privacy interests underlying the challenged protective order.

 Though the court should consider all these factors, and any more deemed relevant, we emphasize that the weight to be given each factor remains primarily the providence of the trial court.

### 3. Balancing the Factors

Having determined that Adams has no absolute right to inspect the sealed depositions, and that the decision whether to modify the protective order to allow him access was a matter consigned to the sound discretion of the trial court, employing a balancing test, we turn now to the various factors at play in this case.

### a. Similarity and Differences Between the Two Lawsuits

 The primary justification given by Adams for viewing the sealed documents is his desire to avoid repetitious discovery. Both suits, he contends, are "vast[ly] similar," and therefore he should be entitled to all discovery generated in the *Phillips* case. As pointed out by Metallica, however, the *Phillips* case is actually quite different from the *Adams* case on its facts. The *Phillips* case involves launching, which, although perhaps describable as a "moshing-type" activity, requires a much different and far more coordinated group effort than ordinary moshing.

More important, Phillips was injured while Metallica was *performing*. Accordingly, there was some basis, at least as far as the timing of the injury, for Phillips's allegation that Metallica had actually incited the crowd, during its performance, to engage in the activity that resulted in his injury. Although Adams has made an identical allegation in his pleadings, also accusing Metallica of inciting the crowd to mosh, such an allegation is patently baseless as it pertains to Adams's injury, since Metallica had yet to take the stage by the time he was found unconscious.

In sum, Adams's claim against Metallica, unlike Phillips's, rests entirely upon the claim of negligent supervision and failure to warn. Both Phillips and Adams alleged that Metallica should have anticipated the crowd's behavior given the raucous nature of its music. (Adams describes Metallica's music as "dark, fast, violent, loud, antisocial and anti-establishment.") In Adams's case, however, in order to succeed, he must take this argument a step further and demonstrate that Metallica should have anticipated how fans would react to the music of an opening act, Suicidal Tendencies. Adams has also the further obstacle of demonstrating that Metallica should have foreseen the possibility of his injury

from moshing. In this regard, cardiac arrest as the result of chest thumping strikes us as far less probable and foreseeable than a broken neck as a result of launching. Finally, Adams must show that Metallica had a duty to take action to prevent moshing, and that its failure to do so proximately caused his injury. For all these reasons, Adams's case against Metallica strikes as facing far more difficulties than the one presented by Phillips.

The majority of cases presented by Adams in support of his argument that intervention is required to avoid repetitious discovery involve alleged antitrust violations in which the second suit involved the same anti-competitive conduct alleged in the first. See, *e.g., Meyer Goldberg, Inc. v. Fisher Foods, Inc.* (C.A.6, 1987), 823 F.2d 159. Obviously, these cases present a much stronger argument in favor of intervention and modification than the ones here, which involve only similar, but not the same, conduct. Adams's case must succeed or fail on its own merits, given the dissimilarities between it and the *Phillips* case. Adams does not argue that access to the depositions of the individual members of Metallica in the *Phillips* case is the only means by which he can obtain their testimony. Indeed, according to Adams, there is no court order precluding him from scheduling the band members for deposition in his case. Nor, it should be pointed out, has Adams argued that viewing the depositions in the *Phillips* case would obviate the need for deposing the band members in his case. Adams's primary interest in the depositions in the *Phillips* case, it would appear, would be for whatever impeachment value they may present.

### b. Metallica's Privacy Interest

In opposing intervention and modification, Metallica argued below that the videotape of the depositions in the *Phillips* case could be commercially exploited by publication over the Internet. Further, the band argued that it had a privacy interest in the testimony itself, presumably upon the basis that the depositions contain material that might be out of character for the public image of the band. Whether a fan of the band or not, one cannot seriously dispute that Metallica has a public image that it wishes to protect, and that in deposition the band members might have been obligated to divulge information and express views that they would not ordinarily wish to share in a public interview or to have recorded as a matter of public record. As stated by counsel for Metallica, "Metallica makes their living selling their image, selling their music, selling themselves, essentially."

### c. Abuse of Discretion

As noted, the trial court's decision on whether to allow intervention and to modify its previous order was ultimately a matter of discretion. Accordingly, it is not particularly relevant whether we may have acted differently if faced with

the same question, since we cannot substitute our judgment for that of the trial court. In order to recognize an abuse of discretion, we must conclude that the trial court's denial of intervention and modification in this case implied an attitude on the part of the court that was "unreasonable, arbitrary, or unconscionable." *Ruwe, supra,* at 61, 29 OBR at 443, 505 N.E.2d at 959.

Because of the significant differences between the two cases, the fact that Adams is not precluded from deposing Metallica as part of the discovery in his case, and the legitimate privacy and commercial interests of the band in keeping the depositions under seal, we cannot say that the trial court abused its discretion in denying Adams's motion to intervene for the purpose of modifying the protective order in the *Phillips* case. As for Adams's argument that the protective order was never independently considered by the trial court in the first instance, we note that, even if he has standing to make this claim, there is no basis in the record to support his contention. At the hearing on the motion to intervene, the trial court expressly rejected the notion that it had simply rubber-stamped an agreed entry. Indeed, according to the attorney for Metallica, Phillips opposed the protective order in an in-chambers hearing on Metallica's oral motion to have the documents sealed.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

SUNDERMANN and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.